108 So.2d 729 (1958)
Theodore R. GIBSON, Ruth Perry, Vernell Albury and Grattan E. Graves, Jr., Appellants,
v.
FLORIDA LEGISLATIVE INVESTIGATION COMMITTEE, Appellee.
Anna ROSENBLATT, Appellant
v.
FLORIDA LEGISLATIVE INVESTIGATION COMMITTEE, Appellee.
Edward T. GRAHAM Appellant,
v.
FLORIDA LEGISLATIVE INVESTIGATION COMMITTEE, Appellee.
Bertha TEPLOW, Appellant,
v.
FLORIDA LEGISLATIVE INVESTIGATION COMMITTEE, Appellee.
Supreme Court of Florida.
December 19, 1958.
Rehearing Denied January 28, 1959.
*731 Robert L. Carter, New York City, and G.E. Graves, Miami, for Theodore R. Gibson, Ruth Perry, Vernell Albury & Grattan E. Graves, Jr., appellants.
Robert J. Ramer, Miami, for Anna Rosenblatt and Bertha Teplow, appellants.
Tobias Simon and Howard W. Dixon, Miami, for Edward T. Graham, appellant.
Mark R. Hawes, Tampa, for appellees.
*732 THORNAL, Justice.
We are here confronted by four separate appeals seeking review of a group of orders entered by one of the Circuit Judges of the Eleventh Judicial Circuit. By the orders each of the appellants was directed to appear before the appellee Florida Legislative Investigation Committee on August 11, 1958, and answer certain questions propounded by the Committee or else suffer the penalties of contempt of court with appropriate punishment. Certain appellants were directed to respond to a subpoena duces tecum by producing various records.
We are called upon to determine the nature and scope of the legislative power to investigate, and the pertinency of certain questions propounded to the appellants. We must consider the state and federal constitutional problems presented by a claimed right of privacy and association, and an asserted privilege against self-incrimination.
The appellee Committee was created by Chapter 57-125, Laws of Florida 1957. In the early part of 1958 the Committee was in the process of conducting an investigation to determine the existence or non-existence of so-called subversive activities in and against the State of Florida. They subpoenaed certain persons including all of the appellants who allegedly are members of the Miami Branch of the National Association for Advancement of Colored People, hereinafter referred to as NAACP. Some of the appellants were officers, others were directors, and others were merely members. The Committee also issued a subpoena duces tecum to certain of the appellants directing them to produce the membership lists, books and records of NAACP. At a Committee hearing held February 26 and 27, 1958, the several appellants declined to answer certain questions for stated reasons which we will discuss later. Those who were summoned to do so likewise declined to produce the membership records of NAACP. In each instance the counsel for the Committee propounded the question, the witness declined to answer it, the Chairman of the Committee directed the witness to answer, and the witness again declined. The Committee itself then approved the action of the Chairman and directed its counsel to petition the Circuit Court for an order compelling answers and directing the production of the membership lists. Section 3, Chapter 57-125, Laws of Florida 1957. Emspak v. United States, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997. The Circuit Judge issued a show cause order to each of the appellants. After a full hearing, the Judge directed the appellants to answer certain questions. He directed three of the appellants to respond to the subpoena duces tecum requiring the production of records. His order provided that upon the failure of the witnesses to answer the questions or produce the membership lists, "then he [or she] shall be in contempt of this court and shall be punished accordingly." The appellants now seek reversal of the orders applicable to them respectively for various reasons hereafter noted.
The contentions of the several appellants vary somewhat according to the nature of the inquiries propounded to them and the reasons given for their refusal to answer. We will discuss these in our consideration of the problems presented by the separate groups of appellants. In addition we will also dispose of the contention that the membership list of the Miami Branch, NAACP, should not be produced pursuant to the subpoena duces tecum.

Basic Constitutional Principles Involved.
The broad but vital principles of constitutional law asserted by the appellants will require cautious analysis when related to the situation presented by these appeals. We are currently passing through what appears to be a period of transition in the application of established constitutional principles. While vocally expressing adherence to the biblical admonition that we "remove not the ancient landmark[s]", *733 Deuteronomy 19:14, some admittedly sincere jurists, with the support of many equally sincere political scientists, have, in our view, undertaken to transplant many of the ancient landmarks of constitutional law. The result we think has been an application of these traditional concepts to situations for which they were never intended or, in other respects, a failure to apply them to situations for which they were intended.
In our effort to resolve some of these difficult and troublesome constitutional problems, we have reminded ourselves that it might be well to note the admonition of Section 15, Declaration of Rights of Virginia, which antedated our Declaration of Independence. In the cited document, the author George Mason, who was regarded as one of the most astute and farsighted of the architects of our government, suggested:
"XV. That no free government, or the blessings of liberty can be preserved to any people but by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles." (Emphasis added.)
In similar fashion the authors of the Declaration of Rights of Massachusetts in Article 18 of that document stated:
"A frequent recurrence to the fundamental principles of the constitution, and a constant adherence to those of piety, justice, moderation, temperance, industry, and frugality, are absolutely necessary to preserve the advantages of liberty, and to maintain a free government." M.G.L.A.Const. pt. 1, art. 18. (Emphasis added.)
In recurring to certain fundamental principles the instant record invites our attention to two concepts of our constitutional democracy which we deem basic to our consideration of the problems presented and the ultimate solution thereof.
The first of these simply is that under the Bill of Rights incorporated in the Constitution of the United States, an individual citizen, regardless of race or creed, is entitled to enjoy certain inalienable rights which cannot be denied to him except in a proper case by due and orderly process of law. While recognizing the rights of the individual, we must of necessity at times reconcile the enjoyment of those rights with the sovereign prerogatives of the state. If and when the two come into conflict in a particular case, it often becomes a judicial responsibility to determine which shall be subordinated to the other under controlling provisions of the organic law.
The second basic principle to which we must here recur is a recognition of those aspects of our governmental structure which have produced a federalism of separate states. Consistent with the above mentioned tendencies in some quarters, we deem it appropriate to recall that American federalism is a co-ordinate union of divided sovereignties. E pluribus unum. If it be true, as our own State Constitution reminds us, that "All political power is inherent in the people", Section 2, Declaration of Rights of Florida, F.S.A., it is equally fundamental that the powers enjoyed by the federal government are those only which are specifically defined in the Constitution of the United States supplemented by those powers essentially implicit in the ones specified. In equal measure powers not so delegated to the federal government nor prohibited to the states were, by the Tenth Amendment to the Constitution of the United States, expressly reserved to the respective states or to the people thereof. It might be well to recall that the Federal Constitution was ratified by conventions of the individual states as separate sovereignties representing the people of each particular state. Madison, Federalist 39. At no time did the people of all of the states as one composite nationwide electorate ever pass on the organic document. See also Florida Law Journal, Vol. XVIII, No. 3, p. 65, "Counter-Revolution *734  An Estimate of the Situation" by R.C. Alley.
In approaching our discussion of the legal questions presented by the instant record, we do so in the belief that certain tendencies toward paternalistic nationalism, which we think we detect in the opinions of some courts and the philosophies of some leaders of government, are, in our humble view at least, inconsistent with these traditional concepts of our constitutional democracy.
Rather than call upon the pristine exponents of the concept such as Jefferson, Madison, Mason and others of their colonial political persuasion, let us look to the most consecrated judicial advocate of centralized nationalism. In Barron, for Use of Tiernan v. Mayor and City Council of Baltimore, 7 Pet. 243, 250, 8 L.Ed. 672, 675, Chief Justice John Marshall wrote:
"But it is universally understood, it is a part of the history of the day, that the great revolution which established the constitution of the United States, was not effected without immense opposition. Serious fears were extensively entertained that those powers which the patriot statesmen, who then watched over the interests of our country, deemed essential to union, and to the attainment of those invaluable objects for which union was sought, might be exercised in a manner dangerous to liberty. In almost every convention by which the constitution was adopted, amendments to guard against the abuse of power were recommended. These amendments demanded security against the apprehended encroachments of the general government  not against those of the local governments." (Emphasis added.)
Spanning the gap of more than one hundred years, in 1958 Mr. Justice Frankfurter expressed the views of the majority of the highest court of the land when in Knapp v. Schweitzer, 357 U.S. 371, 78 S.Ct. 1302, 1305, 2 L.Ed.2d 1393, he wrote:
"It is relevant to remind that our Constitution is one of particular powers given to the National Government with the powers not so delegated reserved to the States or, in the case of limitations upon both governments, to the people. Except insofar as penal remedies may be provided by Congress under the explicit authority to `make all Laws which shall be necessary and proper for carrying into Execution' the other powers granted by Art. 1, § 8, the bulk of authority to legislate on what may be compendiously described as criminal justice, which in other nations belongs to the central government, is under our system the responsibility of the individual States."
We submit that we are not without respectable support for our view.
As we proceed now to a more detailed discussion of the problems at hand we remain fully conscious of the rights of appellants as citizens. These must be reconciled with any conclusion regarding the extent of the State's power to act. We must also consider the effect of certain decisions bearing on the State's authority when equated with the power of the federal government. In all of these involved deliberations, we must admittedly evaluate the influence of the authoritative voice of the Supreme Court of the United States in its interpretation of the federal organic law. All of this we now undertake.

Factual Background.
The factual situation giving rise to these appeals falls logically into several distinct categories with regard to the various appellants. We summarize them as follows:

Appellant Ruth Perry.
The principal questions which appellant Perry was directed to answer involved interrogations as to: whether she was *735 then vice-president of the Miami chapter of the NAACP; whether she was then the secretary of the Florida Conference of NAACP; whether she knew various specifically named people. One particular question in the latter category should be pointed up in detail. The Committee counsel asked the witness, "Do you know a man named Arlington Sands?" Counsel thereupon explained to the witness that on the preceding day one of the witnesses before the Committee had testified that Arlington Sands had been seen by him at Communist Party meetings in Miami and that he also knew him as a member of the Miami Branch of NAACP. The witness Perry also refused to produce the membership list of the Miami Branch of NAACP although the subpoena duces tecum served upon her directed her so to do. The trial judge ordered appellant Perry to answer these various questions. Her objections to answering them were incorporated in a written statement which she filed with the Committee. The sum of her objections were that Chapter 57-125, Laws of Florida 1957, which created the Committee and defined its authority, abridged rights guaranteed to her by the First and Fourteenth Amendments to the Constitution of the United States, Sections 12, 13, 15 and 22 of the Declaration of Rights of the Constitution of Florida, Article II, and Section 16 of Article III, of the Florida Constitution. She objected further to producing the membership lists of the NAACP on the ground that the demand for this list constituted an invasion of her rights to due process of law, freedom of speech and association, and the corresponding rights of the NA ACP.

Appellants Gibson and Albury.
When appellants Gibson and Albury separately appeared before the appellee Committee, admittedly in response to the subpoena served upon them, they were interrogated as to whether they had brought the requested membership lists of the NAA CP. Each of these appellants thereupon read a prepared statement denying any affiliation with the Communist Party but refusing to answer any questions propounded by the Committee on the stated ground that in their view the Committee had demonstrated an antagonistic prejudice toward all the witnesses to the end that it had disqualified itself to conduct an impartial investigation. These witnesses then positively refused to submit to any questioning.

Appellant Gratton E. Graves, Jr.
This witness identified himself as the Miami Attorney for NAACP. He refused to produce any records of the NAACP on the grounds that it would require a breach of confidential relations with his client in violation of his constitutional rights of privacy and freedom of association and a lack of pertinency to the subject under investigation. He denied, however, that he had custody of any records. For similar reasons he declined to answer inquiries as to assurances which he gave the Committee at a prior hearing that the records of NAACP had been sent to New York and that he would undertake to obtain them. Appellant Graves refused also to answer inquiries as to whether he knew one Anna Rosenblatt, Edward T. Graham, Bertha Teplow, or Theodore R. Gibson. He also declind to answer inquiries as to his acquaintance with numerous other people. For the reasons above summarized he refused to identify the whereabouts or custodian of the records called for by the subpoena served upon him. The trial judge directed this witness to answer these various inquiries or else suffer the penalties of contempt.

Appellants Rosenblatt and Teplow.
These witnesses were interrogated as to their place of birth; whether they were naturalized citizens of the United States; whether they were members of the Communist Party of Florida; whether they knew various individuals and whether they knew them to be members of the Communist Party; whether they were members of *736 the NAACP in Dade County; whether they were members of such organizations as Southern Conference for Human Welfare, Civil Rights Congress, or the American-Hungarian Culture Club. They objected to answering this line of questioning on the grounds that it was not pertinent to the subject of the legislative inquiry; that it invaded their rights protected by Sections 1, 2, 12, 13 and 15 of the Declaration of Rights of the Florida Constitution, and the First, Fifth and Fourteenth Amendments to the Constitution of the United States. With reference to the questions as to whether the witnesses were affiliated with the Communist Party or had engaged in official activities for the Communist Party in Florida, the trial judge apparently held the view that Chapter 876, Florida Statutes, F.S.A., condemning subversive or seditious conduct against the State of Florida, remains a valid enactment despite the opinion of the Supreme Court of the United States in Commonwealth of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640. Therefore, he ruled that these witnesses could decline to answer these specific questions on the constitutional ground that by doing so they would be compelled to incriminate themselves contrary to Section 12, Declaration of Rights of Florida. The other types of questions the witnesses were required to answer.

Appellant Graham.
After the filing of our opinion and mandate in the matter of In re Petition of Graham, Fla. 1958, 104 So.2d 16, the trial judge directed Graham to appear before the appellee Committee and answer the questions which he had theretofore declined to answer. In the instant appeal Graham has again declined to answer the questions on the ground that since the filing of our mandate in the prior matter, the Supreme Court of the United States has announced its decision in National Ass'n for Advancement of Colored People v. State of Alabama, ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488. It was his position before the trial judge and is his position now before us that the last cited opinion of the United States Supreme Court in effect overrules and supplants our prior decision in the Graham matter to the extent that he should not be required to produce any membership lists or divulge the membership of the NAACP. The trial judge ruled otherwise.

Constitutionality of Statute Creating Committee.
The appellee legislative Committee was created by Chapter 57-125, Laws of Florida 1957. The powers and duties of the Committee are delineated in Section 2 of the cited statute, which reads as follows:
"It shall be the duty of the committee to make as complete an investigation as times permits of all organizations whose principles or activities include a course of conduct on the part of any person or group which would constitute violence, or a violation of the laws of the state, or would be inimical to the well-being and orderly pursuit of their personal and business activities by the majority of the citizens of this state. Such investigations shall be conducted with the purpose of reporting to this legislature of the activities of such organizations to the end that corrective legislation may be adopted if found necessary to correct any abuses against the peace and dignity of the state."
Although the constitutionality of the statute is assaulted by the appellants, we think we adequately disposed of this contention by our opinion in In re Petition of Graham, etc., supra. There, the same Graham who is presently an appellant had sought to quash a subpoena duces tecum requiring him to produce the books, records and membership lists of NAACP. We sustained the act against an assault on its constitutionality. We now re-affirm our view that the act is constitutional. In our former order we affirmed the trial judge *737 when he denied a motion to quash the subpoena on the ground that Graham's objections because of alleged lack of pertinency to the subject of the inquiry authorized by the statute were premature. We held that it would not be possible to determine whether the subject inquiry would violate his constitutional rights until we were confronted by the actual questions to be propounded.

Legislative Power to Investigate.
It has long been recognized that a legislative body has the power to conduct investigations in order to obtain information on subjects of legislation. Implicit in the power to legislate is the authority to seek out and acquire needed information in the rightful exercise of that power. This may be done through duly constituted committees. Compulsory process is a procedural incident to obtaining the information. McGrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580. Once a valid legislative objective is established then the power of inquiry with effective process to obtain it is an essential concomitant of the legislative authority to act. We here inject the warning that this is not an unbridled power of government. Moderation, restraint and caution should be the rule in exercising it. If not circumscribed by reasonable limitations it is one which could lead to abuses with attendant encroachments on individual liberties. The privilege should never be sadistically employed as a media to "hunt witches." It should never be exercised merely for the sake of disclosure to the detriment of the citizen under interrogation. Legitimate legislative action is the ultimate objective and the prime justification for the inquiry.
We find in this record no evidence whatever that the appellee Committee has in any fashion abused its powers or undertaken to embarrass the appellants merely for the sake of arbitrary disclosure. In actuality the counsel for the Committee publicly announced that no inferences adverse to any of the witnesses should be drawn merely from the fact that they were subpoenaed. He made it clear that the fact that a witness was called should not be construed as a suspicion of his disloyalty. At the opening of the hearing the Chairman of the Committee clearly delineated by an opening statement the reasons for and the subject of the inquiry. His statement is summarized in more detail hereafter. He did this in order to enable the witnesses to determine the pertinency of the questions propounded to them. Chapter 57-125, supra, was read in its entirety. It was made clear throughout the hearing that the NAACP, as an organization, was not considered in and of itself to be associated with the Communist Party. It was pointed out that the purpose of the inquiry was to determine whether members of the Communist Party or fellow travelers had so surreptitiously penetrated and infiltrated the NAACP, as well as other legitimate organizations, as to justify state action on the subject. There can be no doubt, therefore, that all of the witnesses were fully informed as to the subject of the inquiry.
We come next to determine the essential question as to whether the inquiry was being conducted to obtain information to support legitimate legislative objectives. In other words, could the information sought by the Committee be employed by the Florida Legislature as a basis for enacting laws or pursuing other proper legislative action?

State Control of Sedition.
The appellants objected to the pursuit of the investigation by the Committee on the ground that the Florida Legislature had no authority to enact the enabling statute. They further contended that the subject of the inquiry announced by the Chairman was not within the power of the State of Florida to pursue. These contentions were based on the theory that the inquiry was aimed solely toward the *738 investigation of seditious persons, organizations and conduct. They then assert that in Commonwealth of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640, the Supreme Court of the United States has held that by the passage of the so-called Smith Act, 18 U.S.C.A. § 2385, the Congress of the United States has pre-empted the entire field of control and prevention of sedition and the prosecution of seditious conduct. On this reasoning appellants conclude and ask us to agree that the State of Florida is now powerless to control or prevent seditious conduct against the government of the State, the infiltration or penetration of subversive and seditious persons into the community life of the state or into legitimate organizations such as NAACP, which otherwise enjoy the protection of the laws of the state, or in any fashion to direct the exercise of the State's lawmaking powers against these or similar activities.
On this point we are of the view that there is no controlling authority and we are frank to state at the outset that if such is to be the law of Florida, some other court will have to exercise the dubious privilege of announcing it. We do not accord to the opinion of the highest court in the land in Commonwealth of Pennsylvania v. Nelson, supra, the broad comprehensive sweep that is contended for it by the appellants and even conceded by the briefs of the appellee Committee. Admittedly, that decision has been the subject of much comment and some adverse criticism. See Report of Committee on Federal-State Relationships, Conference of Chief Justices, August 23, 1958. In support of the decision see remarks of Chief Justice Charles Alvin Jones of Pennsylvania filed with the Conference on the same date.
The Supreme Courts of some states have taken the position that the Nelson decision determined that by the passage of the Smith Act, Congress has pre-empted every aspect of the field of controlling seditious conduct, even when directed against a particular state. Cf. Albertson v. Millard, 345 Mich. 519, 77 N.W.2d 104; Braden v. Commonwealth, Ky., 291 S.W.2d 843. Illustrative of a more limited interpretation of the Nelson opinion is Commonwealth v. Gilbert, 334 Mass. 71, 134 N.E.2d 13. There, the Supreme Judicial Court of Massachusetts held that because of the Nelson case an indictment charging advocacy of the violent overthrow of the government of Massachusetts would have to be quashed on the theory that Congress had pre-empted the field. The Massachusetts court, however, expressly stated that in its view there could be some kinds of sedition directed so exclusively against the state as to fall outside the scope of Commonwealth of Pennsylvania v. Nelson, supra.
In State v. Diez, Fla. 1957, 97 So.2d 105, we ourselves have previously taken note of the Nelson decision. As against the identical contention now submitted by these appellants, we upheld Section 876.22, Florida Statutes, F.S.A., requiring a so-called Loyalty Oath as a condition to public employment in this state. We there pointed out and we here repeat for emphasis that in the Nelson case the State of Pennsylvania had indicted Nelson for advocacy of the violent overthrow of the government of the United States contrary to the Pennsylvania statute. See Commonwealth v. Nelson, 377 Pa. 58, 104 A.2d 133. Nowhere in the charges against Nelson were there any allegations of seditious conduct against the state. The decision of a court must necessarily be read in the light of the factual situation which produces it. In the Nelson case the Supreme Court of the United States was confronted solely and entirely with the charge of seditious conduct against the United States in violation of a state statute. It is inconceivable to us that the decision could or should be given controlling effect in situations which were not even remotely before the Supreme Court of the United States when its decision was rendered. We certainly respect the authoritative effect of the Nelson decision to the extent that it holds that *739 Congress has pre-empted the field of controlling sedition against the government of the United States. Under all recognized bases for interpreting and construing judicial decisions, we do not feel compelled to accord to the Nelson opinion a more comprehensive or far-reaching effect.
We adopt this view simply because we are not persuaded by Nelson or any other decision that the virility of the states to cope with purely internal problems can be reduced to a condition of impotency by any astute process of judicial sterilization.
By Chapter 876, Florida Statutes, F.S.A., the Legislature of this state has undertaken to prohibit and control any conduct that would lead to the forceful or violent overthrow of the state government. The statute makes illegal the assembly in Florida of two or more persons having as their purpose the promotion or advocacy of such conduct. It appears to us that it would be unthinkable to hold that a state legislature is powerless to prohibit such conduct or the holding of such assemblies within the geographical confines of the state itself.
By Chapter 28221, Laws of Florida 1953, commonly known as the subversive activities law, Sections 876.22-876.31, Florida Statutes, F.S.A., the Legislature of Florida has undertaken to define various subversive organizations. It has prohibited the establishment of such organizations in this state and has proscribed the defined subversive conduct with criminal penalties as the punishment for violation.
To the extent that such statutes proscribe conduct which is inimical to the welfare of the people and the government of this particular state, the Florida Legislature has exercised a legitimate state function. Our search reveals no controlling precedent to the contrary.

Opening Statement of Chairman.
At the outset of the hearings involved in this matter the Chairman of the Committee informed all of the witnesses collectively, including the appellants, that the Committee would concern itself with the activities of various organizations operating in Florida in fields of race relations, the coercive reform of educational and social practices by litigation and pressured administrative action, in the field of labor, education and other phases of life within the state. He told them that to this extent the Committee would concern itself with the Communist Party, its members, its activities, its aims and objectives and the degree, if any, to which Communist and Communistic influences had successfully penetrated or infiltrated various organizations operating in the fields of endeavor which he had previously summarized. Admittedly NAACP is an organization active in the area of race relations. The announced purposes of the Committee inquiry were well within the orbit of the authorizing statute and likewise within the power of the State of Florida to accomplish.
In addition the Committee points out in its brief that aside from any question of pre-emption of control of seditious activities by the Congress, every state has a right to instigate and inaugurate a process for amending the United States Constitution provided it can succeed in obtaining the agreement of the Legislatures of two-thirds of the states. Article V, Constitution of the United States. Under the cited Article of the Federal Constitution, whenever the Legislatures of two-thirds of the states petition the Congress so to do, it is bound to call a Convention for proposing amendments to the Constitution of the United States which amendments shall be subject to subsequent ratification by the Legislatures of three-fourths of the states. Here, we think, the appellee-Committee correctly reasoned that the Florida Legislature has the right to inform itself of the existence or non-existence of the sedition described in order to exercise a proper legislative function. That function is to determine whether the Legislature of Florida *740 deems it wise to institute a movement among the several states to obtain the accord of at least two-thirds of them on an application to the Congress to set in motion the amending procedure. Here again we find a perfectly legitimate area of legislative activity that justifies the pursuit of the investigation under review.

Self-Incrimination.
The trial judge was of the view, as we are, that Commonwealth of Pennsylvania v. Nelson, supra, did not eradicate the subversive activities statutes of the State of Florida insofar as the State itself is concerned. In logical accord with this view he held that when certain of the appellants declined to answer questions regarding their affiliations with the Communist Party on the ground that such answers would tend to incriminate them contrary to the protective provisions of the Fifth Amendment to the Constitution of the United States and Section 12 of the Declaration of Rights of the State of Florida, they were entitled to refuse to answer for the asserted reason. Inasmuch as we have approved the ruling of the trial judge to the effect that the Florida subversive control statutes remain effective and inasmuch as these statutes prescribe criminal penalities for violation, we must in turn affirm his ruling to the effect that the witnesses who were interrogated with reference to their own personal Communistic activities could legitimately assert the protective provisions of Section 12, Declaration of Rights of Florida. In this connection we observe in passing that if it were held that the Congress has pre-empted the entire field to the extent that the Florida Statutes against sedition and subversive conduct are no longer effective, then, of course, Section 12 of our Florida Declaration of Rights would offer no defense against answering these particular questions. Similarly, we have the view that under such a holding the Fifth Amendment to the Constitution of the United States would offer no barrier to State action for the simple reason that there is not here apparent any semblance of an imminent danger of federal prosecution as a result of the State action.
The rule appears to be reasonably well settled that the Fifth Amendment to the Federal Constitution is a limitation only on Federal action. It does not restrict State action, absent the presence of an impending or imminent Federal prosecution as a result of the action by the State. Knapp v. Sweitzer, 357 U.S. 371, 78 S.Ct. 1302, 2 L.Ed.2d 1393; Lorenzo v. Blackburn, Fla. 1954, 74 So.2d 289. Admittedly, to many, this constitutional guarantee against compulsory self-incrimination is little understood and seldom justified in application. We agree that it is rapidly becoming a burden on the American political and judicial conscience to reconcile our organic guarantees of freedom, of which this is one, with the demanding necessity of ferreting out and bringing to proper justice many of our own citizens whose lack of civic conscience permits them to betray the very freedoms which they claim as their protective armor against the purifying glare of public inspection. The fact remains, however, that both the State and Federal Constitutions establish the right. This court has no power to tamper with either document. If a change is made the people will have to make it.

Pertinency.
The next assault on the various questions which appellants were ordered to answer and which are summarized above is based on their contention that the questions lacked pertinency to the subject of the inquiry. To support this contention we are referred to the decision of the Supreme Court of the United States in Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273. It is true that the Watkins decision announced the rule that the questions propounded in a legislative investigation should be pertinent to the subject of the inquiry. It affirms the position, which we have previously announced, that the subject of the inquiry should be made *741 sufficiently clear and definite to inform a witness of the nature of the matter under inquiry. This is so in order to enable the witness to determine the pertinency of any particular question as well as to evaluate his privilege of declining to answer if such is available. The subject of the inquiry should not be afflicted with the so-called "vice of vagueness" thereby depriving the witness of his constitutional rights while under interrogation. In the Watkins case the Supreme Court suggested several methods by which this "vice of vagueness" can be avoided. One is by the authorizing statute or resolution which establishes the Committee and so clearly defines the subject under inquiry that a witness can understand the pertinency of questions propounded to him. A second method is by an "opening statement" by the Chairman of the Committee outlining in detail the subject of the inquiry. This assumes, of course, that the subject of inquiry announced by the Chairman is within the orbit of authorized investigation provided by the enabling statute or resolution. Furthermore, in Watkins the majority pointed out that while purportedly that investigation was dealing with subversive activities in the field of labor, actually many of the witnesses had nothing to do with the labor movement. Here the contrary appears as to members of NAACP.
We find no difficulty in holding that the questions which the trial judge directed the witnesses to answer were in most instances clearly pertinent to the legitimate subject of the inquiry. We will later point out the limited exceptions to the order. Chapter 57-125, supra, the enabling statute, in itself, with reasonable clarity outlined the nature of the investigation. This was supplemented by a positive, clear-cut delineation of the purpose of the inquiry made by the Chairman of the Committee at the outset. Rather than being afflicted with the "vice of vagueness" in this instance, we think that both the enabling statute and the opening statement of the Chairman clearly defined the purpose and scope of the inquiry. Subject to an exception we shall mention we have the view that the questions here involved were pertinent to the authorized inquiry.

Committee Prejudice.
The witnesses Gibson and Albury declined to answer any questions or produce any documents on the ground that the Committee had demonstrated a prejudice that precluded its members from sitting in impartial deliberations over the hearing. They base this contention on statements made by two Committee members at the conclusion of the appearance of the witness Perry. The sum of these statements simply was that in the opinion of one of the Committee members, the witness had been evasive; that she had refused to supply information that would enable the Committee to be of subsequent service to the state; that in so doing she was rendering a great dis-service to the organization of which she was a member as well as to the citizens of Florida. The remarks concluded with the observation that in the opinion of the Committee member the attitude of the witness "is a disgrace". These observations culminated in a motion that counsel for the Committee be directed to prepare procedures to cite the witness for contempt. Another Committee member echoed similar sentiments and seconded the motion. When the witnesses Gibson and Albury subsequently appeared before the Committee pursuant to summons, they refused to answer any questions with their contention that the Committee was biased, prejudiced and unfair. These two appellants cite no authority to support them in their refusal to respond to questioning.
In the first place as we read the remarks of the two members of the Committee we find in them nothing that indicates a bias or prejudice against the complaining appellants or as a matter of fact against the witness to whom they were directed. Our examination of this record suggests that several of these recalcitrant and *742 sometimes defiant witnesses including appellant Perry consistently challenged the authority of the Committee and clearly displayed a policy of complete non-cooperation. We conclude that the witnesses had a perfect right to assert their various constitutional privileges which they deemed to be available. They have the same privilege here. At the same time we are not aware of any constitutional privileges that authorize one so conditioned to defy, berate, or otherwise arbitrarily challenge a duly constituted authority in the exercise of a lawful power. This record sustains the further notion that this Committee and its counsel have throughout this proceeding personified a degree of patience and composure customarily demanded only of judicial officers. For this they are to be commended. The sum of these observations is simply that the two appellants Gibson and Albury have tendered no genuine ground whatsoever for reversal.

NAACP Membership List.
We now approach the contention of the appellant Graham and others with regard to the requirement of the subpoena duces tecum directing them to produce the books, records and membership lists of NAACP. The complaining appellants have produced no records whatsoever. In fact, they admitted at the hearing that they did not bring any of the required records nor did they account for the whereabouts of the records. They have refused to do either. They have objected particularly to the production of the membership lists showing the names of members of the Miami Branch of NAACP. We have the view that the other records are of no material consequence here. They contend here that the order of the trial judge requiring them to respond to the subpoena by the production of such membership lists is directly contrary to the decision of the Supreme Court of the United States in National Ass'n for Advancement of Colored People v. State of Alabama, ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488, hereafter cited as NAACP v. Alabama. The decision last cited was rendered subsequent to our decision In re Petition of Graham, etc., Fla. 1958, 104 So.2d 16. Appellants contend that the effect of our former decision in the Graham matter has been superseded by the decision of the United States Supreme Court in NAACP v. Alabama, supra. In support of their position that they should not be required to produce the membership lists of the Miami Branch of NAACP, these appellants contend that the freedom to engage in a legitimate association for the advancement of beliefs and ideas is an aspect of liberty guaranteed to them by the due process clause of the Fourteenth Amendment to the Constitution of the United States. It is their position that freedom to associate with those of kindred minds for the advancement of legitimate beliefs and ideas is related to the constitutional guarantee of freedom of speech. It should not be curtailed, so they assert, absent some showing of a compelling state interest that justifies the subordination of the individual liberty to the essential requirements of the welfare of the state.
They further assert that in view of the nature of NAACP as an organization devoted to the advancement of the educational, social and economic well-being of the Negro, they occupy, so they contend, a relatively unpopular position in some sections of the country, including Florida. In view of the alleged lack of popularity of the organization itself, as well as its objectives, these appellants then follow with the assertion that the compulsory production of their membership lists revealing the names of their "rank and file members", many of whom earn their living in various menial pursuits, would be to deter such members from participating in the affairs of the organization, from exercising the right to associate and express themselves on the objectives of the organization, and in a measure would result in economic repercussions such as discharge from employment merely because of affiliation with NAACP.
*743 We interpolate that unlike the situation presented in NAACP v. Alabama, supra, the appellants here have not demonstrated by any evidence whatsoever that the production of their membership lists or the identification of members would have such a deterrent effect in the State of Florida. With reference to the attitude of the people of Florida regarding NAACP suffice it to observe that we judicially know from our own records and otherwise that NAACP has actively engaged in the pursuit of its objectives openly, aggressively and without let or hindrance in the State of Florida. The record here presented reveals nothing to the contrary.
In NAACP v. Alabama, supra, the United States Supreme Court was presented with a situation in which the State of Alabama, acting through its Attorney General, was undertaking to oust NAACP from engaging in any intrastate activities because of its failure to comply with the Alabama foreign corporation registration statute, Code 1940, Tit. 10, §§ 192-198. The statute required such a corporation to file its corporate charter and designate a place of business and an agent to receive service of process in the State of Alabama. In the Alabama case NAACP complied with all requirements such as the furnishing of its business records, a copy of its charter, the statement of its purposes, the name of all of its officers and directors, the total number of members within the state and the amount of its dues. They declined to furnish the membership lists which in actuality does not appear to have been a requirement of the Alabama statute. Apparently the list of members was requested merely to attempt to ascertain whether NAACP was engaging in an intrastate business in Alabama. As pointed out above, evidence was presented that satisfied the Supreme Court of the United States that the furnishing of the membership lists would have a deterrent effect upon the exercise of the constitutionally protected right to association asserted by the corporation in behalf of its rank and file members. We pretermit any discussion of the fact that in these appeals NAACP as a corporate entity is not a party.
In addition to recognizing the existence of this individual right as well as a guarantee of its protection by the due process clause of the Fourteenth Amendment, the Supreme Court of the United States in the Alabama case held in sum that in the particular proceeding there involved the interest of the state in obtaining the list of members was not of sufficient compulsion to override the deterrent effect asserted by NAACP. Constitutionally speaking the ultimate conclusion simply was that in order to justify the restriction on the exercise of the individual right to associate, due process under the Fourteenth Amendment requires that the state exhibit a compelling reason motivated by the general welfare.
We do not undertake to question the authoritative effect of the Alabama decision. Admitting for the matter at hand the controlling aspects of the Federal Constitution as interpreted by the Supreme Court of the United States in that case, we have the view that the instant case does not fall within the prohibitive adjudications of that pronouncement. Here, there is no showing whatsoever of the contended deterrent effect. No effort was made to demonstrate it in any evidentiary form. We are here confronted by the bald assertion of the described constitutional privilege of association with no demonstration of infringement as a result of the attempted state action. Furthermore, in the instant case the purpose of the inquiry as authorized by the enabling statute and as delineated by the Committee Chairman certainly, in the absence of any showing to the contrary, tenders a compelling reason in the public interest to conduct the investigation and to require the availability of the requested records as hereafter announced.
*744 We have previously concluded in this opinion that the State of Florida is acting within the orbit of the powers saved to it by the Tenth Amendment when it undertakes to explore the membership of various organizations, legitimate perhaps within themselves but suspected of being the victims of surreptitious infiltration and penetration by subversives and others engaged in illegitimate activities.
Assuming, therefore, the legitimacy of the state objective and the controlling justification grounded in the public interest, we have the view that the action of the appellee Committee in the instant case in demanding that certain officers or custodians of NAACP have available at the hearing the membership records of the organization, accords with the requirements of due process within the specifications announced by the Supreme Court of the United States in National Association for Advancement of Colored People v. State of Alabama, supra. As we pointed out In re Petition of Graham, supra, we cannot determine from this record the actual pertinency or necessity of revealing the entire membership lists of NAACP to the extent that the entire lists should be delivered to the Committee and placed in evidence thereby becoming a matter of public record. To support the position of the appellee Committee in contending for the production of the records, its counsel points out in his brief that other testimony before the Committee reveals the names of more than one hundred individuals who are, or are suspected of being, active Communists. It is asserted that the same persons are suspected of being members or participants in the affairs of the Miami Branch of NAACP. It is then contended that it is necessary to inspect the entire membership lists in order to determine whether such allegedly subversive individuals are in fact members of NAACP. Admittedly, the appellee Committee is investigating only subversive infiltration of the organization. Consequently, the entire contention of appellee on the subject of pertinency on this particular point is limited to the sole proposition of ascertaining whether certain known or suspected Communists or subversives are in any way affiliated with the activities of NAACP. In view of this position of the appellee, the limitations of the requirement of pertinency would restrict their exploration of the membership of the organization to obtaining from the officers or custodians of the membership lists a statement under oath as to whether such suspect persons are in any way associated with NAACP based upon such custodian's reference to the available membership lists or other means of answering the inquiry, such as, having seen such suspected person at meetings of NAACP. Such procedure, we think, accords due regard to the pertinency requirements of Watkins v. United States, supra, as well as the due process requirements of National Ass'n for Advancement of Colored People v. State of Alabama, supra. There may, of course, be other pertinent reasons for obtaining the names of officers, directors and particular members of Miami Branch, NAACP, but pertinency would have to be demonstrated when the inquiry is made.
Similarly, and for identical reasons, we think the trial judge ruled correctly in requiring the various appellants to answer the questions as to whether they themselves were members of NAACP at the time of the inquiry. Conceding the legality of the association and admitting, as the Committee's counsel publicly announced, that no stigma attached merely from membership and further granting to appellants their own contention that their objectives were of the highest, it would be difficult for us to agree that there is constitutional justification for their refusal to answer whether or not they are members. Certainly, this must be the rule in view of the state of this record which fails to disclose any factual basis for a conclusion that the giving of an answer to such *745 questions would result in an illegal invasion of their constitutional right of association.
In accord with the same point of view, but recalling that we have previously affirmed the ruling of the trial judge that certain appellants could employ the cloak of Section 12 of the Declaration of Rights of Florida against answering specific inquiries in regard to their own Communistic activities, we can see no reason why a particular witness who has been properly identified as an officer or member of NAACP should be excused from answering an inquiry as to whether a person who has been otherwise identified with the Communist Party or Communistic activities is a member of NAACP or has participated in its meetings. In this regard we have the view that merely because one knows a Communist, or happens to have been in the company of a Communist, does not convert him into a Communist. Most of the appellants have filed statements affirmatively disclaiming even the remotest personal association with the Communist movement. There is nothing before us which suggests an effort to adjudicate their guilt by association contrary to their own protestations of absolute innocence.
Holding as we have that the legislative objectives of the Committee are legitimate, we think the appellee is within its authority to ascertain whether particular organizations operating in the fields mentioned in the Chairman's opening statement have been afflicted by Communist or subversive infiltration. Illustrative of the type of questioning we here have in mind is the inquiry propounded to the appellant Perry when she was asked by Committee counsel, "Do you know a man named Arlington Sands", the question being accompanied by a statement of counsel that on the preceding day another witness before the Committee had identified Sands as one seen by him in Communist Party meetings in Miami and known by him to be a member of the Miami Branch of NAACP. We deem such a question appropriate even though Sands himself, under oath, denied membership in the Communist Party.

Attorney-Client Relationship.
Appellant Gratton E. Graves, Jr., who was admittedly attorney for Miami Branch of NAACP was interrogated as to whether he had brought with him certain records of the Association including the membership lists as required by the subpoena duces tecum. He responded that he had not and further stated under oath that he did not have custody of the records. He was then subjected to a line of interrogation as to whether on a previous hearing conducted by the immediate predecessor Committee of the appellee he had testified under oath that he had sent these records to the New York headquarters of NAACP and that he would make a good faith effort to obtain their return to Florida. He was asked whether he had made any such effort and was questioned as to the then-present custodian of the records. He declined to answer any of these questions asserting that an answer would require revealing confidential information obtained by him in his relationship as attorney for his client, Miami Branch of NAACP. On the contempt citation the trial judge overruled the objection and directed a response.
We need not concern ourselves on the failure of the witness Graves to produce the records for the reason that he stated under oath that he did not have them. As to the questions regarding his prior testimony before the predecessor Committee and the assurances which he then gave as a witness under oath, we see no basis for excluding answers because of the attorney-client relationship. This is so because of the fact that the witness had already testified as to the then-where-abouts of the records, as to his part in transferring the records out of the state and as to the effort that he would make to obtain their return. These questions merely referred back to the prior testimony *746 which was a matter of record and obviously did not involve confidential communications between attorney and client. On the contrary they involved communications between the witness and the Committee. Bearing in mind that we are not here concerned with any problem of requiring an attorney to reveal a communication that would incriminate his client, we think that it was appropriate to require the witness to respond to the questions as to the present custodian of these records. Inasmuch as we have held that any of the appellants who might be custodians of records would be required to have them available at the hearing, we think it would be illogical to hold that any such custodian could turn these records over to the attorney for the Association to enable the attorney in some fashion to secrete the records and thereby place them beyond the power of the state in a proper proceeding to obtain information as to their where-abouts. The records here sought were not the work-product of the attorney's preparations to represent his client. See Atlantic Coast Line Railroad Co. v. Allen, Fla. 1949, 40 So.2d 115. We have here documents belonging to the client which should be produced if they were in the custody of the client but which an attorney apparently endeavors to conceal by transferring them to the custody of some unnamed individual at some unstated location.
While we recognize that the attorney-client relationship is one of utmost confidence, we think that the rule of exclusion that protects confidential communications arising out of this relationship cannot be invoked to enable a client to use the office of the attorney to evade or avoid an obligation to the courts or other investigative body which the client himself would be required to recognize.

Questions Lacking Pertinency.
Throughout the interrogation of several of the appellants, counsel for the Committee would ask the witness; for example, "Do you know Bertha Teplow", or "Do you know Anna Rosenblatt?" We point out that the questions quoted are merely illustrative of a type of interrogation. To illustrate the point we are about to make we mention a question appearing elsewhere in this opinion where a witness was asked, "Do you know Arlington Sands", and the counsel for the Committee supplemented his question by explaining that a previous witness had testified that Arlington Sands was a suspected member of the Communist Party, thereby demonstrating the pertinency of the inquiry. We have held this to be a pertinent and proper question. However, we think that in the absence of a showing of pertinency by relating the name of the person to a proper subject of the inquiry, the bald question, such as, "Do you know Bertha Teplow", would not in and of itself be pertinent to the inquiry within the rules which we have hereinabove announced. Had counsel gone further, as he did in the "Arlington Sands question", and explained the pertinency of the question by stating the relationship between Bertha Teplow and the subject of the inquiry, then it would have been proper to have required an answer. However, until such pertinency is made clear to the witness, he would be justified in declining to answer on the ground of lack of pertinency. In these instances, therefore, we are compelled to disagree with the trial judge and his order directing answers to particular questions of which these are illustrative will have to be reversed. In an investigation of this nature, unless the pertinency of the question is indisputably clear, when a witness objects on grounds of lack of pertinency it is the duty of the investigative body to point out the manner in which the propounded question is pertinent to the subject of the inquiry. Watkins v. United States, supra.

Summary of Holdings.
For the guidance of the lower court and the parties, we herewith summarize our holdings as follows:

*747 (1) Chapter 57-125, Laws of Florida 1957, establishing appellee Committee is constitutional.
(2) The Florida Legislature, through appellee Committee has the power to investigate the matters stated in the statute and announced by the Chairman as the subject of the inquiry.
(3) A state government acting through its Legislature has the power to control seditious conduct leveled against the state or the conduct of subversive activities within the state. It therefore has the power to investigate the conduct of such activities within the state as a preliminary to legislative action.
(4) The subject of this inquiry was made sufficiently clear by the provisions of the enabling statute and the opening statement of the Chairman.
(5) Certain questions were not shown to be pertinent to the inquiry on the face of this record. Other questions were demonstrated to be clearly pertinent and should be answered or propounded.
(6) There was no basis for the contention that the appellee Committee had disqualified itself by reason of an alleged exhibited prejudice.
(7) Witnesses who were directed to have available the records of NAACP should have them available or else disclose their whereabouts, if they can do either. Such witnesses may be required to refer to such records and answer under oath any inquiry regarding any individual whose association with NAACP is shown to be pertinent to the inquiry in accord with the rules announced in this opinion.
(8) The attorney-client relationship is no barrier to answering the inquiries propounded to the witness Graves.

Conclusion and Judgment.
As we conclude with a degree of apology for the prolixity of our pronouncements we indulge ourselves the hope that it will be apparent to all parties to this record that their cause has been fully and fairly considered. Though the pathway to justice is sometimes as awesome as that which led Sir Galahad to the Holy Grail, nonetheless, the achievement of the desirable objective is equally rewarding and justifies the effort.
As to the appellants Gibson and Albury the judgment is affirmed. As to the other appellants the judgments are affirmed in part and reversed in part and the cause is remanded to the trial judge for further proceedings consistent herewith.
It is so ordered.
TERRELL, C.J., concurs with opinion.
ROBERTS, DREW and O'CONNELL, JJ., concur in opinion by THORNAL, J.
TERRELL, Chief Justice (concurring).
I agree with the pronouncements in the very thorough opinion prepared by Mr. Justice THORNAL. I do not overlook the fact that one being tried by the appropriate court is entitled to the benefit of every constitutional guaranty in support of his defense but in this case appellants were being investigated for subversive activities, clearly violative of state and federal law. Not only that, they are in contravention of the philosophy and principles on which democratic government as we know it rests. When one is charged with being a member of, or who lends allegiance to, an institution or organization which has for its purpose the overthrow of this government by force or violent means, it is not becoming in him to hide or secrete his conduct or identity from an *748 investigating committee. It would be more becoming for him to come forward with proof that he has no connection with such activities and demonstrate conclusively that the charges are groundless. It is the shortest and in fact the only means by which he can clear himself and erase the shadow cast upon him by the charges. A lawyer cannot, consistent with his oath, defend against such charges on any other ground.