# GIBSON *v.* FLORIDA LEGISLATIVE INVESTIGATION COMMITTEE.

No. 6.   Argued December 5, 1961.—Restored to the calendar for reargument April 2, 1962.—Reargued October 10–11, 1962.— Decided March 25, 1963.

*Robert L. Carter* reargued the cause for petitioner. With him on the brief was *Frank D. Reeves.*

*Mark R. Hawes* reargued the cause for respondent. With him on the brief was *Erle B. Askew.*

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

This case is the culmination of protracted litigation involving legislative investigating committees of the State of Florida and the Miami branch of the National Association for the Advancement of Colored People.

The origins of the controversy date from 1956, when a committee of the Florida Legislature commenced an investigation of the N. A. A. C. P. Upon expiration of this committee's authority, a new committee was established to pursue the inquiry. The new committee, created in 1957, held hearings and sought by subpoena to obtain the entire membership list of the Miami branch of the N. A. A. C. P.; production was refused and the committee obtained a court order requiring that the list be submitted. On appeal, the Florida Supreme Court held that

the committee could not require production and disclosure of the entire membership list of the organization, but that it could compel the custodian of the records to bring them to the hearings and to refer to them to determine whether specific individuals, otherwise identified as, or "suspected of being," Communists, were N. A. A. C. P. members. 108 So. 2d 729, cert. denied, 360 U. S. 919.

Because of the impending expiration of the authority of the 1957 committee, the Florida Legislature in 1959 established the respondent Legislative Investigation Committee to resume the investigation of the N. A. A. C. P. The authorizing statute, c. 59–207, Fla. Laws 1959, defining the purpose and operations of the respondent, declared:

"It shall be the duty of the committee to make as complete an investigation as time permits of all organizations whose principles or activities include a course of conduct on the part of any person or group which would constitute violence, or a violation of the laws of the state, or would be inimical to the well-being and orderly pursuit of their personal and business activities by the majority of the citizens of this state. . . ."[1]

---

[1] The prefatory portions of the statute noted the existence of the predecessor committees, recited that the 1957 committee had "been prevented" from conducting its investigations by "the deliberate and almost unanimous action of the witnesses before it in resorting to litigation to frustrate said committee's investigations" and asserted that as a result the committee was "mired down" in numerous lawsuits; the committees' records and reports were said to disclose "a great abuse of the judicial processes," as well as violent or illegal conduct, or the threat thereof, and Communist attempts to "agitate and engender ill-will between the races." The enactment concluded that "there still exists the same grave and pressing need for such a committee to exist . . . to continue and complete the above two committees' work, and to participate in and contest the efforts represented by the

The petitioner, then president of the Miami branch of the N. A. A. C. P., was ordered to appear before the respondent Committee on November 4, 1959, and, in accordance with the prior decision of the Florida Supreme Court, to bring with him records of the association which were in his possession or custody and which pertained to the identity of members of, and contributors to, the Miami and state N. A. A. C. P. organizations. Prior to interrogation of any witnesses the Committee chairman read the text of the statute creating the Committee and declared that the hearings would be "concerned with the activities of various organizations which have been or are presently operating in this State in the fields of, first, race relations; second, the coercive reform of social and educational practices and mores by litigation and pressured administrative action; third, of labor; fourth, of education; fifth, and other vital phases of life in this State." The chairman also stated that the inquiry would be directed to Communists and Communist activities, including infiltration of Communists into organizations operating in the described fields.

Upon being called to the stand, the petitioner admitted that he was custodian of his organization's membership records and testified that the local group had about 1,000 members, that individual membership was renewed annually, and that the only membership lists maintained were those for the then current year.

The petitioner told the Committee that he had not brought these records with him to the hearing and announced that he would not produce them for the purpose of answering questions concerning membership in

above referred to litigation to whittle away further at this State's rights and sovereignty, and to be ever ready to investigate any agitator who may appear in Florida in the interim [between legislative sessions]."

the N. A. A. C. P. He did, however, volunteer to answer such questions on the basis of his own personal knowledge; when given the names and shown photographs of 14 persons previously identified as Communists or members of Communist front or affiliated organizations, the petitioner said that he could associate none of them with the N. A. A. C. P.

The petitioner's refusal to produce his organization's membership lists was based on the ground that to bring the lists to the hearing and to utilize them as the basis of his testimony would interfere with the free exercise of Fourteenth Amendment associational rights of members and prospective members of the N. A. A. C. P.

In accordance with Florida procedure, the petitioner was brought before a state court and, after a hearing, was adjudged in contempt, and sentenced to six months' imprisonment and fined $1,200, or, in default in payment thereof, sentenced to an additional six months' imprisonment. The Florida Supreme Court sustained the judgment below, 126 So. 2d 129, and this Court granted certiorari, 366 U. S. 917; the case was argued last Term and restored to the calendar for reargument this Term, 369 U. S. 834.

I.

We are here called upon once again to resolve a conflict between individual rights of free speech and association and governmental interest in conducting legislative investigations. Prior decisions illumine the contending principles.

This Court has repeatedly held that rights of association are within the ambit of the constitutional protections afforded by the First and Fourteenth Amendments. *NAACP* v. *Alabama,* 357 U. S. 449; *Bates* v. *Little Rock,* 361 U. S. 516; *Shelton* v. *Tucker,* 364 U. S. 479; *NAACP* v. *Button,* 371 U. S. 415. The respondent Committee

does not contend otherwise, nor could it, for, as was said in *NAACP* v. *Alabama, supra,* "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." 357 U. S., at 460. And it is equally clear that the guarantee encompasses protection of privacy of association in organizations such as that of which the petitioner is president; indeed, in both the *Bates* and *Alabama* cases, *supra,* this Court held N. A. A. C. P. membership lists of the very type here in question to be beyond the States' power of discovery in the circumstances there presented.

The First and Fourteenth Amendment rights of free speech and free association are fundamental and highly prized, and "need breathing space to survive." *NAACP* v. *Button,* 371 U. S. 415, 433. "Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates* v. *Little Rock, supra,* 361 U. S., at 523. And, as declared in *NAACP* v. *Alabama, supra,* 357 U. S., at 462, "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] . . . effective . . . restraint on freedom of association . . . . This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." So it is here.

At the same time, however, this Court's prior holdings demonstrate that there can be no question that the State has power adequately to inform itself—through legislative investigation, if it so desires—in order to act and protect its legitimate and vital interests. As this

Court said in considering the propriety of the congressional inquiry challenged in *Watkins* v. *United States,* 354 U. S. 178: "The power . . . to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." 354 U. S., at 187. And, more recently, it was declared that "The scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt* v. *United States,* 360 U. S. 109, 111. It is no less obvious, however, that the legislative power to investigate, broad as it may be, is not without limit. The fact that the general scope of the inquiry is authorized and permissible does not compel the conclusion that the investigatory body is free to inquire into or demand all forms of information. Validation of the broad subject matter under investigation does not necessarily carry with it automatic and wholesale validation of all individual questions, subpoenas, and documentary demands. See, *e. g., Watkins* v. *United States, supra,* 354 U. S., at 197–199. See also *Barenblatt* v. *United States, supra,* 360 U. S., at 127–130. When, as in this case, the claim is made that particular legislative inquiries and demands infringe substantially upon First and Fourteenth Amendment associational rights of individuals, the courts are called upon to, and must, determine the permissibility of the challenged actions, *Watkins* v. *United States, supra,* 354 U. S., at 198–199; "[T]he delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights," *Schneider* v. *State,* 308 U. S. 147, 161. The interests here at stake are

of significant magnitude, and neither their resolution nor impact is limited to, or dependent upon, the particular parties here involved. Freedom and viable government are both, for this purpose, indivisible concepts; whatever affects the rights of the parties here, affects all.

## II.

Significantly, the parties are in substantial agreement as to the proper test to be applied to reconcile the competing claims of government and individual and to determine the propriety of the Committee's demands. As declared by the respondent Committee in its brief to this Court, "Basically, this case hinges entirely on the question of whether the evidence before the Committee [was] . . . sufficient to show probable cause or nexus between the N. A. A. C. P. Miami Branch, and Communist activities." We understand this to mean—regardless of the label applied, be it "nexus," "foundation," or whatever—that it is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest. Absent such a relation between the N. A. A. C. P. and conduct in which the State may have a compelling regulatory concern, the Committee has not "demonstrated so cogent an interest in obtaining and making public" the membership information sought to be obtained as to "justify the substantial abridgment of associational freedom which such disclosures will effect." *Bates* v. *Little Rock, supra,* 361 U. S., at 524. "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling." *Ibid.*

Applying these principles to the facts of this case, the respondent Committee contends that the prior decisions of this Court in *Uphaus* v. *Wyman,* 360 U. S. 72; *Barenblatt* v. *United States,* 360 U. S. 109; *Wilkinson* v. *United States,* 365 U. S. 399; and *Braden* v. *United States,* 365 U. S. 431, compel a result here upholding the legislative right of inquiry. In *Barenblatt, Wilkinson,* and *Braden,* however, it was a refusal to answer a question or questions concerning the witness' *own* past or present membership *in the Communist Party* which supported his conviction. It is apparent that the necessary preponderating governmental interest and, in fact, the very result in those cases were founded on the holding that the Communist Party is not an ordinary or legitimate political party, as known in this country, and that, because of its particular nature, membership therein is *itself* a permissible subject of regulation and legislative scrutiny.[2] Assuming the correctness of the premises on which those cases were decided, no further demonstration of compelling governmental interest was deemed necessary, since the direct object of the challenged questions there was discovery of membership in the Communist Party, a matter held pertinent to a proper subject then under inquiry.

Here, however, it is not alleged Communists who are the witnesses before the Committee and it is not discovery of their membership in that party which is the object of the challenged inquiries. Rather, it is the N. A. A. C. P. itself which is the subject of the investigation, and it is its local president, the petitioner, who was called before

---

[2] See, *e. g., Barenblatt* v. *United States,* 360 U. S. 109, 127–128. Thus, this Court "has upheld federal legislation aimed at the Communist problem which in a different context would certainly have raised constitutional issues of the gravest character." *Id.,* at 128. See also *Communist Party* v. *Subversive Activities Control Board,* 367 U. S. 1, 88–105.

the Committee and held in contempt because he refused to divulge the contents of its membership records. There is no suggestion that the Miami branch of the N.A.A.C.P. or the national organization with which it is affiliated was, or is, itself a subversive organization. Nor is there any indication that the activities or policies of the N. A. A. C. P. were either Communist dominated or influenced. In fact, this very record indicates that the association was and is against communism and has voluntarily taken steps to keep Communists from being members. Each year since 1950, the N. A. A. C. P. has adopted resolutions barring Communists from membership in the organization. Moreover, the petitioner testified that all prospective officers of the local organization are thoroughly investigated for Communist or subversive connections and, though subversive activities constitute grounds for termination of association membership, no such expulsions from the branch occurred during the five years preceding the investigation.

Thus, unlike the situation in *Barenblatt, Wilkinson* and *Braden, supra,* the Committee was not here seeking from the petitioner or the records of which he was custodian any information as to whether he, himself, or even other persons were members of the Communist Party, Communist front or affiliated organizations, or other allegedly subversive groups; instead, the entire thrust of the demands on the petitioner was that he disclose whether other persons were members of the N. A. A. C. P., itself a concededly legitimate and nonsubversive organization.[3]

---

[3] The Florida Supreme Court, in a companion case, *Graham* v. *Florida Legislative Investigation Committee,* 126 So. 2d 133, 136, characterized the N. A. A. C. P. as "an organization perfectly legitimate but allegedly unpopular in the community." Interestingly, in *Graham,* which arose out of the very same hearings held on the same days as here involved, the Florida court, apparently on the same record we now have before us, upheld the Fourteenth Amendment

Compelling such an organization, engaged in the exercise of First and Fourteenth Amendment rights, to disclose its membership presents, under our cases, a question wholly different from compelling the Communist Party to disclose its own membership. Moreover, even to say, as in *Barenblatt, supra,* 360 U. S., at 129, that it is permissible to inquire into the subject of Communist infiltration of educational or other organizations does not mean that it is permissible to demand or require from such other groups disclosure of their membership by inquiry into their records when such disclosure will seriously inhibit or impair the exercise of constitutional rights and has not itself been demonstrated to bear a crucial relation to a proper governmental interest or to be essential to fulfillment of a proper governmental purpose. The prior holdings that governmental interest in controlling subversion and the particular character of the Communist Party and its objectives outweigh the right of individual Communists to conceal party membership or affiliations by no means require the wholly different conclusion that other groups— concededly legitimate—automatically forfeit their rights to privacy of association simply because the general subject matter of the legislative inquiry is Communist subversion or infiltration. The fact that governmental interest was deemed compelling in *Barenblatt, Wilkinson,* and *Braden* and held to support the inquiries there made into membership in the Communist Party does not resolve the issues here, where the challenged questions go to membership in an admittedly lawful organization.

---

claims of a witness, not himself asserted to have subversive connections, who refused to answer questions going to his own membership in the N. A. A. C. P. The court there took notice of the "considerable" evidence of possible or probable reprisals and deterrent effect on the N. A. A. C. P. resulting from involuntary disclosure of affiliation with the organization. *Id.,* at 134–135.

Respondent's reliance on *Uphaus* v. *Wyman, supra,* as controlling is similarly misplaced. There, this Court upheld the right of the State of New Hampshire, in connection with an investigation of whether "subversive" persons were within the State, to obtain a list of guests who attended a World Fellowship summer camp located in the State. In *Uphaus* this Court found that there was demonstrated a sufficient connection between subversive activity—held there to be a proper subject of governmental concern—and the World Fellowship, itself, to justify discovery of the guest list; no semblance of such a nexus between the N. A. A. C. P. and subversive *activities* has been shown here. See III, *infra.* Moreover, contrary to the facts in this case, the claim to associational privacy in *Uphaus* was held to be "tenuous at best," 360 U. S., at 80, since the disputed list was already a matter of public record by virtue of a generally applicable New Hampshire law requiring that places of accommodation, including the camp in question, maintain a guest register open to public authorities. Thus, this Court noted that the registration statute "made public at the inception the association they [the guests] now wish to keep private." 360 U. S., at 81. Finally, in *Uphaus,* the State was investigating whether subversive persons were within its boundaries and whether their presence constituted a threat to the State. No such purpose or need is evident here. The Florida Committee is not seeking to identify subversives by questioning the petitioner; apparently it is satisfied that it already knows who they are.

### III.

In the absence of directly determinative authority, we turn, then, to consideration of the facts now before us. Obviously, if the respondent were still seeking discovery of the entire membership list, we could readily dispose of this case on the authority of *Bates* v. *Little Rock,*

and *NAACP* v. *Alabama, supra;* a like result would follow if it were merely attempting to do piecemeal what could not be done in a single step. Though there are indications that the respondent Committee intended to inquire broadly into the N. A. A. C. P. membership records,[4] there is no need to base our decision today upon a prediction as to the course which the Committee might have pursued if initially unopposed by the petitioner. Instead, we rest our result on the fact that the record in this case is insufficient to show a substantial connection between the Miami branch of the N. A. A. C. P. and Communist *activities* which the respondent Committee itself concedes is an essential prerequisite to demonstrating the immediate, substantial, and subordinating state interest necessary to sustain its right of inquiry into the membership lists of the association.

Basically, the evidence relied upon by the respondent to demonstrate the necessary foundation consists of the testimony of R. J. Strickland, an investigator for the Committee and its predecessors, and Arlington Sands, a former association official.

Strickland identified by name some 14 persons whom he said either were or had been Communists or members of Communist "front" or "affiliated" organizations. His description of their connection with the association was simply that "each of them has been a member of and/or participated in the meetings and other affairs of the N. A. A. C. P. in Dade County, Florida." In addition, one of the group was identified as having made, at an

---

[4] Interrogation was not to be confined simply to ascertaining whether or not the 14 persons, first named by Strickland, the Committee investigator, were members of the N. A. A. C. P. Strickland had named 38 other persons about whom inquiry was to be made, and, even more significantly, the Committee counsel declared that he had "a lot of other people" he wanted to ask about.

unspecified time, a contribution of unspecified amount to the local organization.[5]

We do not know from this ambiguous testimony how many of the 14 were supposed to have been N. A. A. C. P. members. For all that appears, and there is no indicated reason to entertain a contrary belief, each or all of the named persons may have attended no more than one or two wholly public meetings of the N. A. A. C. P., and such attendance, like their membership, to the extent it existed, in the association, may have been wholly peripheral and begun and ended many years prior even to commencement of the present investigation in 1956. In addition, it is not clear whether the asserted Communist affiliations and the association with the N. A. A. C. P., however slight, coincided in time. Moreover, except for passing reference to participation in annual elections, there is no indication that membership carried with it any right to control over policy or activities, much less that any was sought. The reasoning which would find support for the challenged inquiries in Communist attendance at meetings from which no member of the public appears to have been barred is even more attenuated, since the only prerogative seemingly attaching to such attendance was the right to listen to the scheduled speaker or program. Mere presence at a public meeting or bare membership— without more—is not infiltration of the sponsoring organization.

---

[5] It is apparent that no impetus to relevant legislative interest or need can be garnered from Strickland's additional identification of a group of 33 alleged Communists or five more asserted card-carrying party members since these individuals were in no way evidentially connected with the N. A. A. C. P., locally or nationally. Were it otherwise, the mere demonstration of the existence of local and extant Communists would always support a demand for membership lists of any organization which might be thought to be an object of infiltration, and the constitutional guarantees of privacy of association and assembly would become meaningless.

It also appears that a number of the 14 persons named by Strickland were no longer even residents of Florida; as to these people, it is difficult to see any basis for supposing that they would be current—much less influential—members of the Miami branch of the N. A. A. C. P., and no other pertinent reason for the inquiry as to them could be found because, as the petitioner testified, the only membership records available related to the then current year.

Strickland did refer to one informant as having been instructed to infiltrate the N. A. A. C. P. and "other organizations." But any persuasive impact this recitation might otherwise have had is neutralized by the same informant's disclosure that his response to this command was simply to attend N. A. A. C. P. meetings "on occasions" and by the absence of any other substantial indication of infiltration. This is not a case in which, after a proper foundation has been laid, a Communist is himself interrogated about his own alleged subversive activities or those of the Communist Party, all as part of an inquiry related to what this Court has held to be a legitimate legislative purpose to investigate the activities of the party or its knowing members.

The testimony of Sands, the other assertedly important witness, added not even a semblance of anything more convincing with regard to the existence of a connection between subversion and the N. A. A. C. P. Sands, whose officership in the association predated 1950 and who admitted that he was uncertain even as to his then current membership in the N. A. A. C. P., merely corroborated to some extent certain of Strickland's references to attendance at N. A. A. C. P. meetings by a few of the persons identified as Communists. However, this too must have related to some time in the unspecified past, since Sands admitted that he had not even been to an N. A. A. C. P. meeting in two years. Sands also noted that one of the

asserted Communists, a lawyer, had represented the association in a "murder case," but there is no explanation as to how this fact might indicate or support a conclusion of Communist influence.

Nor does the fact that the N. A. A. C. P. has demonstrated its antipathy to communism and an awareness of its threat by passage of annual antisubversion resolutions carry with it any permissible inference that it has, in fact, been infiltrated, influenced, or in any way dominated or used by Communists. Indeed, given the gross improbability of a Communist dominated or influenced organization denouncing communism, the more reasonable inference would seem to be to the contrary.

Finally, the Committee can find no support for its inquiry into the membership list from Strickland's suggestion that Sands had once uncertainly told him (Strickland) that one or possibly two of the group of 14 may have "made a talk" to the local N. A. A. C. P. chapter, again at some unspecified time in the past. There is no indication that the subject of the "talks" was in any way improper and, in any event, such isolated incidents cannot be made to do the work of substantial evidence of subversive influence or infiltration. The same is true of the few additional vague and somewhat unspecific references to other minor and nondirective participation in the affairs of the local group.[6]

This summary of the evidence discloses the utter failure to demonstrate the existence of any substantial relation-

---

[6] For example, on retaking the stand, Strickland said that Sands had told him that one of the 14 had been a member of the N. A. A. C. P. prior to 1950 and that another had "delivered" N. A. A. C. P. "leaflets"; there was also separate testimony that another was believed to have been an N. A. A. C. P. member "at one time." These statements and scattered allusions to a few of the 14 "possibly" having been "seen" at N. A. A. C. P. public meetings obviously cannot support infringement of constitutional rights.

ship between the N. A. A. C. P. and subversive or Communist activities. In essence, there is here merely indirect, less than unequivocal, and mostly hearsay testimony that in years past some 14 people who were asserted to be, or to have been, Communists or members of Communist front or "affiliated organizations" attended occasional meetings of the Miami branch of the N. A. A. C. P. "and/or" were members of that branch, which had a total membership of about 1,000.

On the other hand, there was no claim made at the hearings, or since, that the N. A. A. C. P. or its Miami branch was engaged in any subversive activities or that its legitimate activities have been dominated or influenced by Communists. Without any indication of present subversive infiltration in, or influence on, the Miami branch of the N. A. A. C. P., and without any reasonable, demonstrated factual basis to believe that such infiltration or influence existed in the past, or was actively attempted or sought in the present—in short, without any showing of a meaningful relationship between the N. A. A. C. P., Miami branch, and subversives or subversive or other illegal activities—we are asked to find the compelling and subordinating state interest which must exist if essential freedoms are to be curtailed or inhibited. This we cannot do. The respondent Committee has laid no adequate foundation for its direct demands upon the officers and records of a wholly legitimate organization for disclosure of its membership; the Committee has neither demonstrated nor pointed out any threat to the State by virtue of the existence of the N. A. A. C. P. or the pursuit of its activities or the minimal associational ties of the 14 asserted Communists. The strong associational interest in maintaining the privacy of membership lists of groups engaged in the constitutionally protected free trade in ideas and beliefs may not be substantially infringed upon

such a slender showing as here made by the respondent.[7] While, of course, all legitimate organizations are the beneficiaries of these protections, they are all the more essential here, where the challenged privacy is that of persons

---

[7] There is here even less of a connection with subversive activities than was shown in *Sweezy* v. *New Hampshire,* 354 U. S. 234, in which, on grounds not here relevant, THE CHIEF JUSTICE, writing for four members of the Court, deemed the inquiry improper. There the State Attorney General, as part of an investigation of subversive activities, sought to question a witness who, though he denied that he himself was a Communist, had "a record of affiliation with groups cited by the Attorney General of the United States or the House Un-American Activities Committee," 354 U. S., at 255, 261 (concurring opinion). The contested questions related, *inter alia,* to the activities of third persons in the Progressive Party and "considerable sworn testimony [had] . . . been given in [the] . . . investigation to the effect that the Progressive Party in New Hampshire [had] . . . been heavily infiltrated by members of the Communist Party and that the policies and purposes of the Progressive Party have been directly influenced by members of the Communist Party." *Id.,* at 265 (quoting from state court opinion). The concurring opinion of Mr. Justice Frankfurter, in which MR. JUSTICE HARLAN joined, declared with respect to this supporting demonstration that "the inviolability of privacy belonging to a citizen's political loyalties has so overwhelming an importance to the well-being of our kind of society that it cannot be constitutionally encroached upon on the basis of so meagre a countervailing interest of the State as may be argumentatively found in the remote, shadowy threat to the security of New Hampshire allegedly presented in the origins and contributing elements of the Progressive Party and in petitioner's relations to these." *Ibid.* The concurring opinion concluded that "Whatever, on the basis of massive proof and in the light of history, of which this Court may well take judicial notice, be the justification for not regarding the Communist Party as a conventional political party, no such justification has been afforded in regard to the Progressive Party. A foundation in fact and reason would have to be established far weightier than the intimations that appear in the record to warrant such a view of the Progressive Party. This precludes the questioning that petitioner resisted in regard to that Party." *Id.,* at 266. Precisely the same reasoning applies here. While in *Sweezy* it did not clearly appear that the persons about whom inquiry was made were them-

espousing beliefs already unpopular with their neighbors and the deterrent and "chilling" effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association is consequently the more immediate and substantial. What we recently said in *NAACP* v. *Button, supra,* with respect to the State of Virginia is, as appears from the record, equally applicable here: "We cannot close our eyes to the fact that the militant Negro civil rights movement has engendered the intense resentment and opposition of the politically dominant white community . . . ." 371 U. S., at 435.

Of course, a legislative investigation—as any investigation—must proceed "step by step," *Barenblatt* v. *United States, supra,* 360 U. S., at 130, but step by step or in totality, an adequate foundation for inquiry must be laid before proceeding in such a manner as will substantially intrude upon and severely curtail or inhibit constitutionally protected activities or seriously interfere with similarly protected associational rights. No such foundation has been laid here. The respondent Committee has failed to demonstrate the compelling and subordinating governmental interest essential to support direct inquiry into the membership records of the N. A. A. C. P.

Nothing we say here impairs or denies the existence of the underlying legislative right to investigate or legislate with respect to subversive activities by Communists or anyone else; our decision today deals only with the manner in which such power may be exercised and we hold simply that groups which themselves are neither engaged

selves asserted to have Communist associations, the interest in political and associational privacy was no stronger there than here; if anything, the fact that the legitimate organization itself—rather than a witness suspected of subversive ties—is here put to questioning through its president and that it is its own membership records which are the objects of scrutiny makes the claimed right worthy of more—not less—protection.

in subversive or other illegal or improper activities nor demonstrated to have any substantial connections with such activities are to be protected in their rights of free and private association. As declared in *Sweezy* v. *New Hampshire*, 354 U. S. 234, 245 (opinion of THE CHIEF JUSTICE), "It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas . . . ."

To permit legislative inquiry to proceed on less than an adequate foundation would be to sanction unjustified and unwarranted intrusions into the very heart of the constitutional privilege to be secure in associations in legitimate organizations engaged in the exercise of First and Fourteenth Amendment rights; to impose a lesser standard than we here do would be inconsistent with the maintenance of those essential conditions basic to the preservation of our democracy.

The judgment below must be and is

*Reversed.*

MR. JUSTICE BLACK, concurring.

I concur in the Court's opinion and judgment reversing the judgment of the Supreme Court of Florida although, for substantially the same reasons stated by MR. JUSTICE DOUGLAS in his concurring opinion, I would prefer to reach our decision by a different approach. I agree with MR. JUSTICE DOUGLAS that the Fourteenth Amendment makes the First Amendment applicable to the States and protects the freedoms of religion, speech, press, assembly, and petition from state abridgment with the same force and to the same degree that the First Amendment protects them from federal abridgment. That, as the cases cited by MR. JUSTICE DOUGLAS show, is what this Court has previously held. I agree also that these Amendments

encompass freedom of the people to associate in an infinite number of organizations including the National Association for the Advancement of Colored People, of which petitioner here was president at the time it was under investigation by the Florida committee. In my view the constitutional right of association includes the privilege of any person to associate with Communists or anti-Communists, Socialists or anti-Socialists, or, for that matter, with people of all kinds of beliefs, popular or unpopular. I have expressed these views in many other cases and I adhere to them now.* Since, as I believe, the National Association for the Advancement of Colored People and its members have a constitutional right to choose their own associates, I cannot understand by what constitutional authority Florida can compel answers to questions which abridge that right. Accordingly, I would reverse here on the ground that there has been a direct abridgment of the right of association of the National Association for the Advancement of Colored People and its members. But, since the Court assumes for purposes of this case that there was no direct abridgment of First Amendment freedoms, I concur in the Court's opinion, which is based on constitutional principles laid down in *Schneider* v. *Irvington,* 308 U. S. 147, 161 (1939), and later cases of this Court following *Schneider.*

MR. JUSTICE DOUGLAS, concurring.

I join the opinion of the Court, because it is carefully written within the framework of our current decisions. But since the matters involved touch constitutional

---

*E. g., American Communications Assn. v. Douds, 339 U. S. 382, 445 (1950); Dennis v. United States, 341 U. S. 494, 579 (1951); Barenblatt v. United States, 360 U. S. 109, 134 (1959); Communist Party v. Subversive Activities Control Board, 367 U. S. 1, 137, 147 (1961).

rights and since I see the Constitution in somewhat different dimensions than are reflected in our decisions, it seems appropriate to set out my views.

We deal here with the authority of a State to investigate people, their ideas, their activities. By virtue of the Fourteenth Amendment [1] the State is now subject to the same restrictions [2] in making the investigation as the First Amendment places on the Federal Government.

---

[1] See Brennan, The Bill of Rights and the States, 36 N. Y. U. L. Rev. 761, 770–778.

[2] Some have believed that these restraints as applied to the States through the Due Process Clause of the Fourteenth Amendment are less restrictive on them than they are on the Federal Government. That is the view of my Brother HARLAN. See *Roth* v. *United States,* 354 U. S. 476, 501, 506; *Smith* v. *California,* 361 U. S. 147, 169. Mr. Justice Jackson expressed the same view in *Beauharnais* v. *Illinois,* 343 U. S. 250, 288. And compare the opinions of Justices Holmes and Brandeis in *Gitlow* v. *New York,* 268 U. S. 652, 672, and *Whitney* v. *California,* 274 U. S. 357, 372. But that view has not prevailed. The Court has indeed applied the same First Amendment requirements to the States as to the Federal Government.

As stated by MR. JUSTICE BLACK in *Speiser* v. *Randall,* 357 U. S. 513, 530 (concurring opinion):

"[T]he First Amendment . . . of course is applicable in all its particulars to the States. See, *e. g., Staub* v. *City of Baxley,* 355 U. S. 313; *Poulos* v. *New Hampshire,* 345 U. S. 395, 396–397; *Everson* v. *Board of Education,* 330 U. S. 1, 8; *Thomas* v. *Collins,* 323 U. S. 516; *Board of Education* v. *Barnette,* 319 U. S. 624, 639; *Douglas* v. *Jeannette,* 319 U. S. 157, 162; *Martin* v. *Struthers,* 319 U. S. 141; *Murdock* v. *Pennsylvania,* 319 U. S. 105, 109; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571; *Bridges* v. *California,* 314 U. S. 252, 263; *Cantwell* v. *Connecticut,* 310 U. S. 296, 303; *Schneider* v. *State,* 308 U. S. 147, 160; *Lovell* v. *Griffin,* 303 U. S. 444, 450; *De Jonge* v. *Oregon,* 299 U. S. 353, 364; *Gitlow* v. *New York,* 268 U. S. 652, 666."

These cases are inconsistent with the view that First Amendment rights protected against state invasion by the Due Process Clause of the Fourteenth Amendment are a watered-down version of what the First Amendment guarantees.

The need of a referee in our federal system has increased with the passage of time, not only in matters of commerce but in the field of civil rights as well. Today review of both federal and state action threatening individuals' rights is increasingly important if the Free Society envisioned by the Bill of Rights is to be our ideal. For in times of crisis, when ideologies clash, it is not easy to engender respect for the dignity of suspect minorities and for debate of unpopular issues. As the President of Yale University has stated:

> "We have become too much a nation of lookers and listeners, a nation of spectators. Amidst the easy artificiality of our life, the plethora of substitutes for learning and thinking, the innumerable devices for avoiding or delegating personal responsibility for our opinions, even for having any opinions, the fine edge of our faith has been dulled, our creative powers atrophied." A. Whitney Griswold, Baccalaureate Address, Yale University, June 8, 1958 (Overbrook Press).[3]

When the State or Federal Government is prohibited from dealing with a subject, it has no constitutional privilege to investigate it. An investigation to permit a legislature properly to perform its powers of internal management is of course allowed. See *Barry* v. *Cunningham,* 279 U. S. 597, 613. But otherwise the power to investigate is only an adjunct of the power to legislate—an auxiliary power "necessary and appropriate to that end." *McGrain* v. *Daugherty,* 273 U. S. 135, 175. Investigation to determine how constitutional laws are being administered marks one limitation. The other is an investigation to determine what constitutional laws should be passed.

---

[3] See Reich, Mr. Justice Black and the Living Constitution, 76 Harv. L. Rev. 673, 727–750.

When the constitutional limits of lawmaking are passed, investigation is out of bounds, apart from the exception noted. See *Kilbourn* v. *Thompson,* 103 U. S. 168, 194–200; *McGrain* v. *Daugherty, supra,* 171–175. That is to say, investigations by a legislative committee which "could result in no valid legislation on the subject" are beyond the pale. *Kilbourn* v. *Thompson, supra,* p. 195. For it misses the whole point of our constitutional history to assume that "government," or any branch of government, somehow has rights and powers of its own apart from those necessarily attending the proper performance of its constitutional functions.

Joining a lawful organization, like attending a church, is an associational activity that comes within the purview of the First Amendment, which provides in relevant part: *"Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people, peaceably to assemble, and to petition the government for a redress of grievances."* "Peaceably to assemble" as used in the First Amendment necessarily involves a coming together, whether regularly or spasmodically. Historically the right to assemble was secondary to the right to petition, the latter being the primary right.[4] But today, as the Court stated in *De Jonge* v. *Oregon,* 299 U. S. 353, 364, "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." Assembly, like speech, is indeed essential "in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means." *Id.,* p. 365. "The holding of meetings for peaceable political

---

[4] Corwin, The Constitution and What it Means Today (1958), p. 203; Arendt, On Revolution (1963), p. 25.

action cannot be proscribed." *Ibid.* A Free Society is made up of almost innumerable institutions through which views and opinions are expressed, opinion is mobilized, and social, economic, religious, educational, and political programs are formulated.[5]

---

[5] Jefferson's grand design included a division "into hundreds"—a viable ward system through which the people exercised their rights of sovereignty. Letter to John Tyler, May 26, 1810:

"I have indeed two great measures at heart, without which no republic can maintain itself in strength. 1. That of general education, to enable every man to judge for himself what will secure or endanger his freedom. 2. To divide every county into hundreds, of such size that all the children of each will be within reach of a central school in it. But this division looks to many other fundamental provisions. Every hundred, besides a school, should have a justice of the peace, a constable and a captain of militia. These officers, or some others within the hundred, should be a corporation to manage all its concerns, to take care of its roads, its poor, and its police by patrols, etc. (as the selectmen of the eastern townships). Every hundred should elect one or two jurors to serve where requisite, and all other elections should be made in the hundreds separately, and the votes of all the hundreds be brought together. Our present captaincies might be declared hundreds for the present, with a power to the courts to alter them occasionally. These little republics would be the main strength of the great one. We owe to them the vigor given to our revolution in its commencement in the Eastern States, and by them the Eastern States were enabled to repeal the embargo in opposition to the Middle, Southern and Western States, and their large and lubberly division into counties which can never be assembled. General orders are given out from a centre to the foreman of every hundred, as to the sergeants of an army, and the whole nation is thrown into energetic action, in the same direction in one instance and as one man, and becomes absolutely irresistible. Could I once see this I should consider it as the dawn of the salvation of the republic, and say with old Simeon, 'nunc dimittis Domine.' " 12 Writings of Thomas Jefferson (Mem. ed. 1904) 393–394.

And see letter to John Cartwright, June 5, 1824, 16 Jefferson, *op cit., supra,* 42, 44–46; letter to Samuel Kercheval, July 12, 1816, 15 Jefferson, *op. cit., supra,* 32–44; and letter to Samuel Kercheval, September 5, 1816. *Id.,* at 70–71.

Joining groups seems to be a passion with Americans. Schlesinger, The Rise of the City (1933), reviews the zeal with which Americans in the last century became the world's greatest "joiners":

> "Now Americans turned with furious zeal to the creation of secret societies cut to their own pattern. In the large cities some form of organized social commingling seemed called for to replace the spontaneous friendliness of small rural towns. Liberty and equality this generation was willing to take for granted, but fraternity filled a compelling human need. Moreover, the romantic opportunity to posture before a mystic brotherhood in all the glory of robe, plume and sword restored a sense of self-importance bruised by the anonymity of life amidst great crowds. If further inducement were needed, it was supplied by the provision made by most lodges for sickness and death benefits for their members.

> . . . . .

> "As was to be expected, membership was greatest in the urbanized sections of the country notwithstanding the energy with which the Negroes of the South aped their white brethren and the increasing interest of Western farmers in lodge activities. By the end of the period there were over six million names on the rosters of fraternal bodies. America possessed more secret societies and a larger number of 'joiners' than all other nations." *Id.*, pp. 288–290.

"It is not surprising, therefore, to find that at least five thousand national associations exist in the United States." Robison, Protection of Associations From Compulsory Disclosure of Membership, 58 Col. L. Rev. 614, 622.

A coming together is often necessary for communication—for those who listen as well as for those who speak.

Demosthenes, it is said, went to the seashore and declaimed to the waves in order to correct a stammer. But normally a speaker implies an audience. Joining a group is often as vital to freedom of expression as utterance itself. Registering as a student in a school or joining a faculty is as vital to freedom of expression as joining a church is to the free exercise of religion. Joining a political party may be as critical to expression of one's views as hiring reporters is to the establishment of a free press. Some have thought that political and academic affiliations have a preferred position under the due process version of the First Amendment. See *Sweezy* v. *New Hampshire,* 354 U. S. 234, 261–267 (concurring opinion). But the associational rights protected by the First Amendment are in my view much broader and cover the entire spectrum in political ideology as well as in art, in journalism, in teaching, and in religion.

In my view, government is not only powerless to legislate with respect to membership in a lawful organization; it is also precluded from probing the intimacies of spiritual and intellectual relationships in the myriad of such societies and groups that exist in this country, regardless of the legislative purpose sought to be served. "[T]he provisions of the First Amendment . . . of course reach and limit . . . investigations." *Barenblatt* v. *United States,* 360 U. S. 109, 126. If that is not true, I see no barrier to investigation of newspapers, churches, political parties, clubs, societies, unions, and any other association for their political, economic, social, philosophical, or religious views. If, in its quest to determine whether existing laws are being enforced or new laws are needed, an investigating committee can ascertain whether known Communists or criminals are members of an organization not shown to be engaged in conduct properly subject to regulation, it is but a short and inexorable step to the conclusion that

it may also probe to ascertain what effect they have had on the other members. For how much more "necessary and appropriate" this information is to the legislative purpose being pursued!

It is no answer to the conclusion that all such investigations are illegal to suggest that the committee is pursuing a lawful objective in the manner it has determined most appropriate. For, as Laurent Frantz, The First Amendment in the Balance, 71 Yale L. J. 1424, 1441, has so persuasively shown, "it does not follow that any objective can ever be weighed against an express limitation on the means available for its pursuit. The public interest in the suppression of crime, for example, cannot be weighed against a constitutional provision that accused persons may not be denied the right to counsel." When otherwise valid legislation is sought to be applied in an unconstitutional manner we do not sustain its application. See, *e. g., Yick Wo* v. *Hopkins,* 118 U. S. 356. A different test should not obtain for legislative investigations. "[A]ny constitutional limitation serves a significant function only insofar as it stands in the way of something which government thinks ought to be done. Nothing else needs to be prohibited." [6] Frantz, *supra,* at 1445.

---

[6] "But the advocate of 'judicial restraint' will insist that where there is room for a reasonable difference of opinion between . . . [the legislative body] and the Court as to whether certain action violates the first amendment, . . . [the legislature's] view should take precedence. There are excellent reasons why it should not. First of all, 'Congress shall make no law . . .' is an obvious and express effort to restrain . . . [legislative] power. If that restraint is to be effective, then . . . [the legislature] is the least appropriate body in the world to be accorded the final word as to what it means. And, while I have no desire to re-wage the general battle for judicial review, the evidence is reasonably clear that the first amendment was proposed with the express expectation and intention that the courts would enforce it." *Id.,* at 1447–1448.

For some of us a phase of the problem emerged in *United States* v. *Rumely,* 345 U. S. 41, 57–58 (concurring opinion), where several problems were posed. Can the Government demand of a publisher the names of the purchasers of his publications? Would not the spectre of a government agent then look over the shoulder of everyone who reads? Might not the purchase of a book or pamphlet today result in a subpoena tomorrow? Would not the fear of criticism go with every person into the bookstall? If the light of publicity may reach any student, any teacher, would not free inquiry be discouraged? For are there not always books and pamphlets that are critical of the administration or that preach an unpopular policy in domestic or foreign affairs or that are in disrepute in the orthodox school of thought? If the press and its readers were subject to the harassment of hearings, investigations, reports, and subpoenas, government would indeed hold a club over speech and over the press. Recognition of these dangers prompted our decision in *Talley* v. *California,* 362 U. S. 60, holding unconstitutional an ordinance requiring handbills to disclose the name and address of the distributor or printer. Plainly a legislative committee could not have obtained the same information from the petitioner in that case merely because it was seeking to determine whether Communists were behind the distribution as part of a massive propaganda campaign.

The problem was exposed again in *Russell* v. *United States,* 369 U. S. 749, where the press was being investigated. What I said there seems germane here. Since what an editor writes or thinks is none of the Government's business—except, of course, that Congress could punish the breach of a carefully drawn security law; see *Near* v. *Minnesota,* 283 U. S. 697, 715–716—it has no

power to investigate the capacities, ideology, prejudices, or politics of those who write the news.

"It is said that Congress has the power to determine the extent of Communist infiltration so that it can know how much tighter the 'security' laws should be made. This proves too much. It would give Congress a roving power to inquire into fields in which it could not legislate. If Congress can investigate the press to find out if Communists have infiltrated it, it could also investigate the churches for the same reason. Are the pulpits being used to promote the Communist cause? Were any of the clergy ever members of the Communist Party? How about the governing board? How about those who assist the pastor and perhaps help prepare his sermons or do the research? Who comes to the confession and discloses that he or she once was a Communist?" 369 U. S., at 777.

*Bryant* v. *Zimmerman,* 278 U. S. 63, 72, held that the Due Process Clause of the Fourteenth Amendment did not prevent a State from compelling a disclosure of the membership lists of the Ku Klux Klan. That decision was made in 1928 and it is unnecessary to decide now whether its vitality has survived such cases as *NAACP* v. *Alabama,* 357 U. S. 449; *Bates* v. *Little Rock,* 361 U. S. 516; and *Louisiana* v. *NAACP,* 366 U. S. 293, for we distinguished that case in *NAACP* v. *Alabama, supra,* at 465, saying, *inter alia,* "The decision was based on the particular character of the Klan's activities, involving acts of unlawful intimidation and violence." Moreover, the incorporation of the First Amendment into the Fourteenth had only recently been adumbrated (see *Gitlow* v. *New York,* 268 U. S. 652, 666) and the full exposition of the right of association that is part of the periphery of the

First Amendment had not yet been made. Indeed *Pierce* v. *Society of Sisters*, 268 U. S. 510, which sustained the right of parents to avoid public schools and to put their children in parochial schools, rested in part on the property interest of the parochial schools. *Id.*, pp. 534–535.

The right of association has become a part of the bundle of rights protected by the First Amendment (see, *e. g.*, *NAACP* v. *Alabama, supra*), and the need for a pervasive right of privacy against government intrusion has been recognized, though not always given the recognition it deserves.[7] Unpopular groups

---

[7] See generally Beaney, The Constitutional Right to Privacy in the Supreme Court, 1962 Supreme Court Review, 212; Dykstra, The Right Most Valued by Civilized Man, 6 Utah L. Rev. 305; Robison, Protection of Associations from Compulsory Disclosure of Membership, 58 Col. L. Rev. 614; Frantz, The First Amendment in the Balance, 71 Yale L. J. 1424.

A part of the philosophical basis of this right has its roots in the common law. As Warren and Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 196, stated:

"The intensity and complexity of life, attendant upon advancing civilization, have rendered necessary some retreat from the world, and man, under the refining influence of culture, has become more sensitive to publicity, so that solitude and privacy have become more essential to the individual; but modern enterprise and invention have, through invasions upon his privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury."

See also *Olmstead* v. *United States*, 277 U. S. 438, 471, 472–479 (dissenting opinion, Brandeis, J.); *Poe* v. *Ullman*, 367 U. S. 497, 509, 515–522 (dissenting opinion).

Whether the problem involves the right of an individual to be let alone in the sanctuary of his home or his right to associate with others for the attainment of lawful purposes, the individual's interest in being free from governmental interference is the same, and, except for the limited situation where there is "probable cause" for believing that he is involved in a crime, the government's disability is equally complete.

(*NAACP* v. *Alabama, supra*) like popular ones are protected. Unpopular groups if forced to disclose their membership lists may suffer reprisals or other forms of public hostility. *NAACP* v. *Alabama, supra,* p. 462. But whether a group is popular or unpopular, the right of privacy implicit in the First Amendment creates an area into which the Government may not enter.

> "Freedom of religion and freedom of speech guaranteed by the First Amendment give more than the privilege to worship, to write, to speak as one chooses; they give freedom not to do nor to act as the government chooses. The First Amendment in its respect for the conscience of the individual honors the sanctity of thought and belief. To think as one chooses, to believe what one wishes are important aspects of the constitutional right to be let alone." *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 467–468 (dissenting opinion).

There is no other course consistent with the Free Society envisioned by the First Amendment. For the views a citizen entertains, the beliefs he harbors, the utterances he makes, the ideology he embraces and the people he associates with are no concern of government.[8] That article of faith marks indeed the main difference between the Free Society which we espouse and the dictatorships both on the Left and on the Right.

As MR. JUSTICE BLACK said (dissenting) in *Barenblatt* v. *United States, supra,* 150–151:

> "The fact is that once we allow any group which has some political aims or ideas to be driven from

---

[8] As to problems raised when disclosure of members of a political organization which represents a foreign government is required, see *Communist Party* v. *Control Board,* 367 U. S. 1.

the ballot and from the battle for men's minds because some of its members are bad and some of its tenets are illegal, no group is safe. Today we deal with Communists or suspected Communists. In 1920, instead, the New York Assembly suspended duly elected legislators on the ground that, being Socialists, they were disloyal to the country's principles. In the 1830's the Masons were hunted as outlaws and subversives, and abolitionists were considered revolutionaries of the most dangerous kind in both North and South. Earlier still, at the time of the universally unlamented alien and sedition laws, Thomas Jefferson's party was attacked and its members were derisively called 'Jacobins.' Fisher Ames described the party as a 'French faction' guilty of 'subversion' and 'officered, regimented and formed to subordination.' Its members, he claimed, intended to 'take arms against the laws as soon as they dare.' History should teach us then, that in times of high emotional excitement minority parties and groups which advocate extremely unpopular social or governmental innovations will always be typed as criminal gangs and attempts will always be made to drive them out. It was knowledge of this fact, and of its great dangers, that caused the Founders of our land to enact the First Amendment as a guarantee that neither Congress nor the people would do anything to hinder or destroy the capacity of individuals and groups to seek converts and votes for any cause, however radical or unpalatable their principles might seem under the accepted notions of the time."

If a group is engaging in acts or a course of conduct that is criminal, it can be prosecuted, and it and its members can be investigated, save as the Self-Incrimination

Clause of the Fifth Amendment sets up a barrier. In *Louisiana* v. *NAACP, supra,* a state statute requiring the N. A. A. C. P. to register and disclose its membership lists was involved. We denied enforcement of that law, saying that we are "in an area where, as *Shelton* v. *Tucker,* 364 U. S. 479, emphasized, any regulation must be highly selective in order to survive challenge under the First Amendment." 366 U. S., at 296. And we added:

> "At one extreme is criminal conduct which cannot have shelter in the First Amendment. At the other extreme are regulatory measures which, no matter how sophisticated, cannot be employed in purpose or in effect to stifle, penalize, or curb the exercise of First Amendment rights." *Id.,* p. 297.

The Florida court in this case said that a requirement of nondisclosure would provide an "ideological asylum for those who would destroy by violence the very foundations upon which their governmental sanctuary stands." 126 So. 2d 129, 132. But there is no showing here that the N. A. A. C. P. is engaged in any criminal activity of any kind whatsoever. The Florida Supreme Court in *Graham* v. *Florida Legislative Investigation Committee,* 126 So. 2d 133, 136, conceded that the N. A. A. C. P. is "an organization perfectly legitimate but allegedly unpopular in the community." Whether it has members who have committed crimes is immaterial. One man's privacy may not be invaded because of another's perversity. If the files of the N. A. A. C. P. can be ransacked because some Communists may have joined it, then all walls of privacy are broken down. By that reasoning the records of the confessional can be ransacked because a "subversive" or a criminal was implicated. By that reasoning an entire church can be investigated because one member was an ideological stray or had once been a Communist or be-

cause the minister's sermon paralleled the party line. By that reasoning the files of any society or club can be seized because members of a "subversive" group had infiltrated it.

In sum, the State and the Federal Governments, by force of the First Amendment, are barred from investigating any person's faith or ideology by summoning him or by summoning officers or members of his society, church, or club.

Government can intervene only when belief, thought, or expression moves into the realm of action that is inimical to society. That was Jefferson's view. In his Bill for Establishing Religious Freedom he spoke primarily of religious liberty but in terms applicable to freedom of the mind in all of its aspects. It was his view that in the Free Society men's ideas and beliefs, their speech and advocacy are no proper concern of government. Only when they become brigaded with action can government move against them. Jefferson said: [9]

> ". . . that the opinions of men are not the object of civil government, nor under its jurisdiction; that to suffer the civil magistrate to intrude his powers into the field of opinion and to restrain the profession or propagation of principles on supposition of their ill tendency is a dangerous fallacy, which at once destroys all religious liberty, because he being of course judge of that tendency will make his opinions the rule of judgment, and approve or condemn the sentiments of others only as they shall square with or suffer from his own; that it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts

---

[9] The Works of Thomas Jefferson (Fed. ed. 1904), Vol. 2, pp. 440–441.

against peace and good order; and finally, that truth is great and will prevail if left to herself; that she is the proper and sufficient antagonist to error, and has nothing to fear from the conflict unless by human interposition disarmed of her natural weapons, free argument and debate; errors ceasing to be dangerous when it is permitted freely to contradict them."

Madison too knew that tolerance for all ideas across the spectrum was the only true guarantee of freedom of the mind: [10]

"Whilst all authority in it will be derived from and dependent on the society, the society itself will be broken into so many parts, interests and classes of citizens, that the rights of individuals, or of the minority, will be in little danger from interested combinations of the majority. In a free government the security for civil rights must be the same as that for religious rights. It consists in the one case in the multiplicity of interests, and in the other in the multiplicity of sects. The degree of security in both cases will depend on the number of interests and sects . . . ."

Once the investigator has only the conscience of government as a guide, the conscience can become "ravenous," as Cromwell, bent on destroying Thomas More, said in Bolt, A Man For All Seasons (1960), p. 120. The First Amendment mirrors many episodes where men, harried and harassed by government, sought refuge in their conscience, as these lines of Thomas More show:

"MORE: And when we stand before God, and you are sent to Paradise for doing according to your con-

---

[10] Federalist, No. 51.

science, and I am damned for not doing according to mine, will you come with me, for fellowship?

"CRANMER: So those of us whose names are there are damned, Sir Thomas?

"MORE: I don't know, Your Grace. I have no window to look into another man's conscience. I condemn no one.

"CRANMER: Then the matter is capable of question?

"MORE: Certainly.

"CRANMER: But that you owe obedience to your King is not capable of question. So weigh a doubt against a certainty—and sign.

"MORE: Some men think the Earth is round, others think it flat; it is a matter capable of question. But if it is flat, will the King's command make it round? And if it is round, will the King's command flatten it? No, I will not sign." *Id.,* pp. 132–133.

Where government is the Big Brother,[11] privacy gives way to surveillance. But our commitment is otherwise.

---

[11] "Outside, even through the shut window pane, the world looked cold. Down in the street little eddies of wind were whirling dust and torn paper into spirals, and though the sun was shining and the sky a harsh blue, there seemed to be no color in anything except the posters that were plastered everywhere. The black-mustachio'd face gazed down from every commanding corner. There was one on the house front immediately opposite. BIG BROTHER IS WATCHING YOU, the caption said, while the dark eyes looked deep into Winston's own. Down at street level another poster, torn at one corner, flapped fitfully in the wind, alternately covering and uncovering the single word INGSOC. In the far distance a helicopter skimmed down between the roofs, hovered for an instant like a blue-bottle, and darted away again with a curving flight. It was the Police Patrol, snooping into people's windows. The patrols did not matter, however. Only the Thought Police mattered." Orwell, Nineteen Eighty-Four (1949), 4.

By the First Amendment we have staked our security on freedom to promote a multiplicity of ideas, to associate at will with kindred spirits, and to defy governmental intrusion into these precincts.[12]

Mr. Justice Harlan, whom Mr. Justice Clark, Mr. Justice Stewart, and Mr. Justice White join, dissenting.

The difficulties with this decision will become apparent once the case is deflated to its true size.

The essential facts are these. For several years before petitioner was convicted of this contempt, the respondent,

---

[12] "Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. . . ."

"Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression. Such must be the rule if authority is to be reconciled with freedom. . . ." *Whitney* v. *California*, 274 U. S. 357, 375, 377 (concurring opinion of Mr. Justice Brandeis).

a duly authorized Committee of the Florida Legislature, had been investigating alleged Communist "infiltration" into various organizations in Dade County, Florida, including the Miami Branch of the National Association for the Advancement of Colored People.[1]  There was no suggestion that the branch itself had engaged in any subversive or other illegal activity, but the Committee had developed information indicating that 14 of some 52 present or past residents of Dade County, apparently at one time or another members of the Communist Party or connected organizations,[2] were or had been members or had "participated in the meetings and other affairs" of this local branch of the N. A. A. C. P.

Having failed to obtain from prior witnesses, other than its own investigator, any significant data as to the truth or falsity of this information, the Committee, in 1959, summoned the petitioner to testify, also requiring that he bring with him the membership records of the branch.  Petitioner, a Negro clergyman, was then and for the past five years had been president of the local branch, and his custodianship of the records stands conceded.

On his appearance before the Committee petitioner was asked to consult these records himself and, after doing so, to inform the Committee which, if any, of the 52 individually identified persons were or had been members of the N. A. A. C. P. Miami Branch.   He declined to do this on two grounds.  *First,* he said that the N. A. A. C. P. itself had already undertaken action "excluding from our ranks any and all persons who may have subversive tendencies."

---

[1] We are told by counsel for the Committee, without contradiction by the petitioner, that the investigations of the predecessor committees have included the activities of such persons and organizations as John Casper, the Ku Klux Klan, and the Seaboard White Citizens Council.

[2] The Committee's information as to such membership has not been challenged in this case.

To substantiate this, petitioner furnished the Committee with copies of "Anti-Communism" resolutions which he stated had been adopted each year since 1950 at the Association's annual convention. *Second,* petitioner protested that production of the membership records would violate "a legal right of ours, the right of association." At the same time the petitioner expressed willingness to testify from recollection as to the membership or nonmembership in the local branch of any persons that the Committee might name to him.

The petitioner was then asked to state from recollection the N. A. A. C. P. membership *vel non* of the 14 persons mentioned above, photographs of each being exhibited to him. But he was unable to supply any information, disclaiming even knowledge of most of the names. He was then again asked to utilize the membership records as a testimonial aid, it having been earlier made clear to him that the Committee itself did not propose to look at the records:

> "[By Committee counsel]. Now, are you aware of the fact, Reverend, that we're not actually asking you to turn over to this Committee those records, but that we're asking that you bring those records here for the purpose of consulting them yourself and telling us, under oath, after consulting them, whether or not certain people who we will name are members, or have been members of your organization?
> "[By the witness]. I'm aware of it."

Petitioner persisted in his refusal. This contempt charge and conviction, and its affirmance by the Supreme Court of Florida, 126 So. 2d 129, followed.

## I.

This Court rests reversal on its finding that the Committee did not have sufficient justification for including

the Miami Branch of the N. A. A. C. P. within the ambit of its investigation—that, in the language of our cases (*Uphaus* v. *Wyman,* 360 U. S. 72, 79), an adequate "nexus" was lacking between the N. A. A. C. P. and the subject matter of the Committee's inquiry.

The Court's reasoning is difficult to grasp. I read its opinion as basically proceeding on the premise that the governmental interest in investigating Communist infiltration into admittedly nonsubversive organizations, as distinguished from investigating organizations themselves suspected of subversive activities, is not sufficient to overcome the countervailing right to freedom of association. *Ante,* pp. 547–549. On this basis "nexus" is seemingly found lacking because it was never claimed that the N. A. A. C. P. Miami Branch had itself engaged in subversive activity, *ante,* pp. 554–555, and because none of the Committee's evidence relating to any of the 52 alleged Communist Party members was sufficient to attribute such activity to the local branch or to show that it was dominated, influenced, or used "by Communists." *Ante,* pp. 550–555.

But, until today, I had never supposed that any of our decisions relating to state or federal power to investigate in the field of Communist subversion could possibly be taken as suggesting any difference in the degree of governmental investigatory interest as between Communist infiltration *of* organizations and Communist activity *by* organizations. See, *e. g., Barenblatt* v. *United States,* 360 U. S. 109 (infiltration into education); *Wilkinson* v. *United States,* 365 U. S. 399, and *Braden* v. *United States,* 365 U. S. 431 (infiltration into basic industries); *Russell* v. *United States,* 369 U. S. 749, 773 (infiltration of newspaper business).

Considering the number of congressional inquiries that have been conducted in the field of "Communist infiltration" since the close of World War II, affecting such

diverse interests as "labor, farmer, veteran, professional, youth, and motion picture groups" (*Barenblatt, supra,* at 119), it is indeed strange to find the strength of state interest in the same type of investigation now impugned. And it is not amiss to recall that government evidence in Smith Act prosecutions has shown that the sensitive area of race relations has long been a prime target of Communist efforts at infiltration. See *Scales* v. *United States,* 367 U. S. 203, 235, 245, 249 n. 26, 251, 255–256.

Given the unsoundness of the basic premise underlying the Court's holding as to the absence of "nexus," this decision surely falls of its own weight. For unless "nexus" requires an investigating agency to prove in advance the very things it is trying to find out, I do not understand how it can be said that the information preliminarily developed by the Committee's investigator was not sufficient to satisfy, under any reasonable test, the requirement of "nexus."

Apart from this, the issue of "nexus" is surely laid at rest by the N. A. A. C. P.'s own "Anti-Communism" resolution, first adopted in 1950, which petitioner had voluntarily furnished the Committee before the curtain came down on his examination:

### "Anti-Communism

"Whereas, certain branches of the National Association for the Advancement of Colored People are being rocked by internal conflicts between groups who follow the Communist line and those who do not, which threaten to destroy the confidence of the public in the Association and which will inevitably result in its eventual disruption; and

"Whereas, it is apparent from numerous attacks by Communists in their official organs 'The Daily Worker' and 'Political Affairs' upon officials of the

Association that there is a well-organized, nationwide conspiracy by Communists either to capture or split and wreck the NAACP; therefore be it

"Resolved, that this Forty-First Convention of the National Association for the Advancement of Colored People go on record as unequivocally condemning attacks by Communists and their fellow-travelers upon the Association and its officials, and in order to safeguard the good-name of the Association, promote and develop unity, eliminate internal ideological friction, increase the membership and build the necessary power effectively to wage the fight for civil rights, herewith, call upon, direct and instruct the National Board of Directors to appoint a committee to investigate and study the ideological composition and trends of the membership and leadership of the local units with a view to determining causes of the aforementioned conflicts, confusion and loss of membership; be it further

"Resolved, that this Convention go on record as directing and instructing the Board of Directors to take the necessary action to eradicate such *infiltration,* and if necessary to suspend and reorganize, or lift the charter and expel any unit, which, in the judgment of the Board of Directors, upon a basis of the findings of the aforementioned investigation and study of local units comes under Communist or other political control and combination." (Emphasis added.)

It hardly meets the point at issue to suggest, as the Court does (*ante,* p. 554), that the resolution only serves to show that the Miami Branch was in fact free of any Communist influences—unless self-investigation is deemed constitutionally to block official inquiry.

582

## II.

I also find it difficult to see how this case really presents any serious question as to interference with freedom of association. Given the willingness of the petitioner to testify from recollection as to individual memberships in the local branch of the N. A. A. C. P., the germaneness of the membership records to the subject matter of the Committee's investigation, and the limited purpose for which their use was sought—as an aid to refreshing the witness' recollection, involving their divulgence only to the petitioner himself (*supra*, pp. 577–578)—this case of course bears no resemblance whatever to *NAACP* v. *Alabama,* 357 U. S. 449, or *Bates* v. *Little Rock,* 361 U. S. 516. In both of those cases the State had sought general divulgence of local N. A. A. C. P. membership lists without any showing of a justifying state interest. In effect what we are asked to hold here is that the petitioner had a constitutional right to give only partial or inaccurate testimony, and that indeed seems to me the true effect of the Court's holding today.

I have scrutinized this record with care to ascertain whether any unfairness in the Committee's proceedings could be detected. I can find none. In the questioning and treatment of witnesses, explanations of pertinency, rulings on objections, and general conduct of the inquiry, I perceive nothing in this record which savors of other than a decorous attitude on the part of the Committee and a lawyerlike and considerate demeanor on the part of its counsel. Nor do I find in the opinion of the Florida Supreme Court the slightest indication of anything other than a conscientious application of the constitutional principles governing cases such as this.

There can be no doubt that the judging of challenges respecting legislative or executive investigations in this sensitive area demands the utmost circumspection on the

part of the courts, as indeed the Florida Supreme Court has itself recognized. See *Graham* v. *Florida Legislative Investigation Comm.*, 126 So. 2d 133, 135. But this also surely carries with it the reciprocal responsibility of respecting legitimate state and local authority in this field. With all respect, I think that in deciding this case as it has the Court has failed fully to keep in mind that responsibility.

I would affirm.

MR. JUSTICE WHITE, dissenting.

In my view, the opinion of the Court represents a serious limitation upon the Court's previous cases dealing with this subject matter and upon the right of the legislature to investigate the Communist Party and its activities. Although one of the classic and recurring activities of the Communist Party is the infiltration and subversion of other organizations, either openly or in a clandestine manner, the Court holds that even where a legislature has evidence that a legitimate organization is under assault and even though that organization is itself sounding open and public alarm, an investigating committee is nevertheless forbidden to compel the organization or its members to reveal the fact, or not, of membership in that organization of named Communists assigned to the infiltrating task.

While the Court purports to be saving such a case for later consideration, it is difficult for me to understand how under today's decision a Communist in the process of performing his assigned job could be required to divulge not only his membership in the Communist Party but his membership or activities in the target organization as well. The Court fails to articulate why the State's interest is any the more compelling or the associational rights any the less endangered when a known Communist is asked whether he belongs to a protected association than

here when the organization is asked to confirm or deny that membership. As I read the Court's opinion the exposed Communist might well, in the name of the associational freedom of the legitimate organization and of its members including himself, successfully shield his activities from legislative inquiry. Thus to me the decision today represents a marked departure from the principles of *Barenblatt* v. *United States,* 360 U. S. 109, and like cases.

On the other hand, should a legislature obtain ostensibly reliable information about the penetration of Communists into a particular organization, information which in the course of things would be placed on public record like the testimony here, there could no longer be a weighty interest on the part of that organization to refuse to verify that information or to brand it as false. This is particularly true here where an officer of the association is willing to identify persons from memory and where the organization itself has called upon its own members to root out Communists who are bent upon using the association to serve the goals of the Communist Party. Unbending resistance to answering, one way or the other, a legislative committee's limited inquiries in the face of already public information to the same effect reduces the association's interest in secrecy to sterile doctrine. I would have thought that the freedom of association which is and should be entitled to constitutional protection would be promoted, not hindered, by disclosure which permits members of an organization to know with whom they are associating and affords them the opportunity to make an intelligent choice as to whether certain of their associates who are Communists should be allowed to continue their membership. In these circumstances, I cannot join the Court in attaching great weight to the organization's interest in concealing the presence of infiltrating Communists, if such be the case.

The net effect of the Court's decision is, of course, to insulate from effective legislative inquiry and preventive legislation the time-proven skills of the Communist Party in subverting and eventually controlling legitimate organizations. Until such a group, chosen as an object of Communist Party action, has been effectively reduced to vassalage, legislative bodies may seek no information from the organization under attack by duty-bound Communists. When the job has been done and the legislative committee can prove it, it then has the hollow privilege of recording another victory for the Communist Party, which both Congress and this Court have found to be an organization under the direction of a foreign power, dedicated to the overthrow of the Government if necessary by force and violence. I respectfully dissent.