MAKAR, J.,
dissenting.
I.
Our Court’s Latin motto, like that of the Florida Supreme Court, is “Sat Cito, Si Recte,” which roughly translated means “Soon Enough, If Correct.” In cases such as this one, where time is important and prompt judicial action is needed, the “soon enough” aspect of the motto takes second billing, which is why the emergency three-judge panel acted with speed and diligence upon being assigned to this matter on short notice just days before the underlying trial was to begin. Absent expedited appellate review, the uncontested constitutional privilege of the non-parties was in danger of being lost without due process of law, which can only be provided by careful appellate review of whether the strict test for overriding the constitutional privilege had been met. Conversely, expedited review of the plaintiffs’ claim that they had met the strict test was of obvious importance given the soon-to-start bench trial. From a judicial administration perspective, an evidentiary ruling of the type at issue should not be made on the eve-of-trial in a case such as this one, but appellate courts generally don’t control when or what is presented to them.
Because the matter was time sensitive, involved an evidentiary ruling that ordinarily is reviewed by certiorari (here, by appeal because it was brought by a non-party), and no litigant had asked us to pass through the case to the Florida Supreme Court at that time, the emergency panel structured the briefing so that a disposition would be made prior to the end of the trial with time for potential review in the Florida Supreme Court, if necessary. Much like us, the trial judge bemoaned the shortness of time but he explicitly told the non-parties they “just need to go over to the DCA real quick and say, Judge Lewis is not giving us the protection we want, and see if they will give you some relief in that way.” Because it was a bench trial, not involving a jury, the trial logistics could be adapted to allow for this Court’s review.
Expedited briefing was ordered, no party making any mention that time was so critical and the issues so important that the case should bypass this Court. To the contrary, the plaintiffs asked only to clarify “whether their answer brief should be marked confidential and held under seal by the clerk.” The panel then undertook intense review of the legal arguments as well as the record, which included the 538 pages of constitutionally-protected documents. The panel spent countless hours digging deeply into the matter by: (1) reviewing each of the documents; (2) assessing the arguments why the documents were highly relevant in the litigation given the other non-privileged evidence that existed; and (3) determining whether the stringent standard for overcoming the privilege existed in the record below. On this point, it bears emphasis that Judge Terry Lewis, Special Master Major Har *233 ding, and the three-judge panel all unequivocally agreed that a constitutional privilege existed, one that the plaintiffs had a high burden to overcome. Constitutionally-privileged information isn’t entirely off-limits at trial, but it is clear that a party seeking to overcome the privilege must meet the exceptionally high standard that courts, including the United States Supreme Court, have established for when the constitutional privilege must give way. Indeed, the parties, the non-parties, and all judges involved at the time agreed that the “strict scrutiny” test applied in the Perry[15] case should apply.
The only relevant issue presented to the panel was whether Judge Terry Lewis, an exceptionally well-regarded jurist, correctly applied this stringent test in determining whether the constitutional privilege had been overcome by the plaintiffs.[16] Judge Lewis’s orders simply concluded— without any detailed explanation or legal analysis — that 588 documents he culled from the pile of almost 2,000 documents could be used in the imminent public trial. No individualized explanation was given why any of documents, or categories of documents, were highly relevant and the strict test necessary to overcome their constitutionally-privileged status met. The documents would be kept sealed, but a gaping hole was opened by allowing them to be used and discussed in a public setting. Absent appellate review, the non-parties’ constitutional privilege was in jeopardy; this appeal was their only opportunity to protect that privilege, which no one disputes they possess. A close analogy is a ruling that a reporter must disclose her sources in an ongoing public trial; if forced to do so without appellate review, the protection afforded by the reporter’s constitutional privilege is lost. The trial judge fully appreciated the conundrum, but was adamant that he was not going to close the proceedings.
Those were the challenging circumstances the three-judge emergency panel confronted: a barebones order lacking any justification and an imminent trial where privileged information was in danger of being revealed. A reversal on that basis alone would have been appropriate. But we undertook to explain — and it was entirely reasonable under the then-existing circumstances — that the trial judge’s orders, and our plenary review of the record, failed to show that the plaintiffs met the exceedingly difficult test for overcoming the constitutional privilege as to the 588 documents. Shortly after briefing concluded, we met and decided that the orders could not be sustained on the record presented.
What the panel did next falls into the category of “no good deed goes unpunished.” Consistent with its goal of expedited adjudication, it decided to avoid delay by issuing a dispositive order on the merits with written opinion to follow soon thereafter. Doing so would let the trial court — and the Florida Supreme Court— know that a panel adjudication on the merits had occurred, one the supreme court could choose to review immediately upon issuance of an expedited written opinion. The panel’s dispositive order was in the clerk’s office about to be released. Moments beforehand, however, the plaintiffs filed a motion asking that we pass through the case to the Florida Supreme Court. Because we’d already entered a dispositive order, and felt a written opinion would be *234 helpful to the supreme court, we denied that motion in an order simultaneously released with the dispositive order within the hour that day.
On the Tuesday following the intervening holiday weekend, our opinions were posted internally for expedited release, but a non-panel member moved for a hearing en banc, the effect of which was the withdrawal of the pending opinions. What happened next, of course, is the supreme court later that day stayed our order pending the trial’s completion, allowing the use of the privileged documents in a non-public proceeding thereby preserving the non-parties’ constitutional privilege, presumably so that either the trial judge could have a second opportunity to apply the Perry test to any privileged document the plaintiffs sought to enter into evidence, or to preserve the non-parties’ rights to appellate review in this case. The panel interpreted the supreme court’s order as permitting the release of the panel’s opinions (which, of course, would be stayed pending completion of trial), which would “close the loop” on the supreme court’s exercise of jurisdiction. But a renewed en banc motion was made that effectively prevented that from occurring and which added weeks of avoidable delay in the ultimate disposition of this case. Had the en banc majority simply allowed our opinions to issue, the supreme court could have accepted review and probably adjudicated the matter by now; and it would have had the benefit of our opinions, even if they chose to disagree with them. Using the en banc process simply to second-guess a panel’s denial of a belated pass through motion,[17] or to claim at this point that the panel should have sua sponte done so on its own, has no apparent benefit; delay is the only benefactor.
Because the en banc majority chose to withdraw our order on the merits and the denial of the pass through motion, the panel is entitled to explain the reasoning undergirding its initial adjudication of this case. Indeed, the supreme court encourages the district courts to provide it with written opinions, which helps clarify the issues and legal reasoning. My special concurrence to the then-majority opinion— verbatim as it existed at the time of the Florida Supreme Court’s intervening decision — is below. Whether the panel’s opinions are of help now, or have been eclipsed by intervening events, is uncertain; the privilege issue is now in a different posture compared to when the trial court first decided the issue. For instance, it appears that only a small subset of the 588 documents (82 pages) are now at issue, making the trial judge’s initial ruling overbroad as applied to 95% of the subject documents. If the trial judge is allowed to undertake a second opportunity to issue a more detailed ruling on the 32 documents’ admissibility, which would be (and would have been) of great help to facilitate appellate review, he will have the benefit of our nonbinding analysis, which — as of almost a month ago — concluded that nothing in the then-existing record on the constitutional privilege had been overcome; perhaps *235 something newly added to the record below, but unavailable at the time this appeal was briefed, has changed the legal landscape.
In conclusion, my resolve today is the same as it was over a month ago when this appeal was first lodged and the emergency panel called to duty: we must work in the appellate judiciary with the same intensity as the trial judge and the litigants to ensure that justice prevails as to all interests in these lawsuits. An easy way out would have been to punt this case onto the Florida Supreme Court’s plate, relieving the panel from its primary responsibility to review the evidentiary matter presented. But had we done so, we’d have run afoul of Justice Barkett’s statement “admonish[ing] the district courts in the future to discharge their responsibility to initially address the questions presented in a given case. [Pass through jurisdiction] is not to be used as a device for avoiding difficult issues by passing them through to this Court.” Carawan v. State, 515 So.2d 161, 162 n. 1 (Fla.1987), superceded by statute on other grounds, ch. 88-131, § 7, Laws of Fla. as recognized in Hammonds v. State, 548 So.2d 909 (Fla. 1st DCA 1989); see also Diana L. Martin & Robin I. Bresky, Taking the Pathway of Discretionary Review Toward Florida’s Highest Court, 88 Fla. B.J. 55, 57 (Nov.2009) (noting that use by supreme court of pass through jurisdiction “is understandably limited.”). Also, as Judge Farmer has noted, “[w]e do not have much in the way of guidance as to when and under what circumstances we should ... send a case immediately to the Supreme Court for resolution. When we do so, we thereby bypass the constitutional right to review in the district courts of final judgments of the circuit courts. Thus it should be rare that we consider doing so.” Fla. Dep’t of Agrie. & Consumer Servs. v. Haire, 832 So.2d 778, 781 (Fla. 4th DCA 2002); see also Tracy S. Carlin, The Ins and Outs of Pass-Through Jurisdiction, 80 Fla. B.J. 42, 42 (Dec.2006) (noting that “the court has not articulated any particular guidelines to assist parties and the district courts in predicting which types of cases the supreme court will hear.”). Given the limited and rare nature of pass through jurisdiction and the supreme court’s admonitions that district courts not shirk their responsibilities, we chose to roll up our sleeves and give it our best in a time-sensitive way that was expedited but not a rush to judgment, which is what supporters of our form of government expect of judicial officers.
II.
This section contains my special concurrence verbatim as submitted for public release prior to the Florida Supreme Court’s decision dated May 27, 2014, modified only to acknowledge that the panel decision to which I was concurring is now a dissent.
“Our form of government is built on the , premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights. Exercise of these basic freedoms in America has traditionally been through the media of political associations.” [18]
Concurring in the [former majority/now dissenting opinion of Judge Marstiller], I write solely to emphasize the independent duty of the judicial branch of this state to protect the federal constitutional rights of persons or associations engaged in political *236 activities from unwarranted governmental infringement.
This is a First Amendment case. At issue is the compelled disclosure and use in a public trial of confidential internal e-mail communications of a political consulting firm, one with many clients including a major political party in the fourth (perhaps third by now) most populous state in the Nation. Our three-judge panel, the trial judge, and the special master (a former Chief Justice of the Florida Supreme Court) have unequivocally concluded that all 538 pages of the documents at issue are legally protected by the First Amendment to the United States Constitution under basic freedoms of political association. Private political consulting — even if done for remuneration and for partisan purposes — involves protected speech and associational activities that are at the core of our constitutional democracy. Party affiliation, ideological view, or political gravitas of the people or associations involved are of no moment: our federal constitution equally applies in shielding the political activities of private persons and entities from governmental overreach absent the most compelling of reasons and proof. Justifiably so, the judiciary has cautiously guarded against legislative and executive overstepping lest a fear of governmental intrusion chill the robust degree of political discourse and civic engagement the Founders envisioned; the deleterious effects on a political organization’s activities and relationships from compelled disclosures and testimony are obvious.
Under the Supremacy Clause of the United States Constitution, our foremost obligation is to protect federal civil rights, whether they be rights of a free press, equal protection, due process, or — as in this case — political association. Concomitantly, we must enforce — to the extent permissible under federal law — the provisions of our state constitution, including article III, sections 20 and 21, which are at issue here and were addressed in League of Women Voters of Florida v. Florida House of Representatives, 132 So.3d 135 (Fla.2013). Unlike the present case, the legal dispute in League of Women Voters was a wholly intramural one between two portions of our state constitution: does the Fair Districts amendment prevail over the claim of legislative privilege rooted in the state constitution’s separation of powers clause? The balance to be drawn was between these competing state constitutional provisions, the supreme court holding that its “first obligation is to give meaning to the explicit prohibition in the Florida Constitution against improper partisan or discriminatory intent in redistricting.” Id. at 149.
A different balance presents itself in this case, one in which our obligation is to protect rights of political association under the federal constitution while concurrently effectuating the state’s interest in ensuring the purposes of article III, sections 20 and 21 are fulfilled. In League of Women Voters, our supreme court indicated that the scope of the evidence and testimony that may prove useful in showing that article III, sections 20 or 21 have been violated is broad. As a result, the discovery in this case — much like the nature of the litigation itself — is unprecedented: legislators, legislative staff, political consultants and others have been deposed and required to testify; tens of thousands of pages of documents, communications, and data have been obtained; and expert testimony and statistical reports have been generated.
Amidst this evidentiary mountain is discovery obtained from subpoenas, public records, and depositions from a private political consulting firm, which has no official role in the redistricting process, but *237 which the plaintiffs claim has some indirect involvement. The firm has already produced all of its emails and other external communications made with legislators or their staff for possible use at trial. And its principal has been deposed, testified live before the special master (but not the trial judge), and is scheduled to testify at trial. Testimony of other witnesses and evidence related to the firm’s activities is also available. What remains undisclosed for use at trial lie at the core of the firm’s operations: its private internal e-mail communications, primarily related to its private clients. Every judge to review them has held these communications are protected under the federal constitution — and that their disclosure and use in a public trial would chill and impede the fundamental federal right of political association.
To overturn the firm’s First Amendment privilege in these communications plaintiffs must meet the test set out in Perry v. Schwarzenegger, 591 F.3d 1147, 1164 (9th Cir.2010), a case not previously adopted by any Florida court, but one all the parties rely upon and whose underpinnings are rooted in Supreme Court precedents. Given the gravity of the federal constitutional privilege at stake, the test is one of the most difficult to meet, requiring “exacting scrutiny” through proof that the “information sought is highly relevant” (“a more demanding standard of relevance” than is ordinarily applied); the request is “carefully tailored to avoid unnecessary interference with protected activities and the information must be otherwise unavail-ablet]”; and the balancing of interests demonstrates that the “burdens imposed on individuals and associations” are outweighed by the benefits of disclosure. Id. at 1161.[19]
■ As applied, the special master held that the non-parties’ communications are protected under Perry, the plaintiffs failing to show “a compelling need sufficient to deny” the non-parties’ constitutional privilege. The trial judge agreed in part, ruling that the “internal political communication made between” the non-parties are constitutionally protected and the non-parties’ fear that disclosure would chill rights is a “logical and reasonable” conclusion on this record; he ruled without any stated reasons or application of the factors in Perry, however, that 538 documents could be used at public trial. Our three-judge panel painstakingly reviewed all of the disputed communications including each of the specific ones discussed as potentially relevant on pages 20-21 and 32-35 of the plaintiffs’ answer brief. Applying the principles of Perry, we have unanimously concluded that the First Amendment privilege applies, the record failing to show that plaintiffs met the “exacting scrutiny” required and extraordinarily heavy burden imposed to overcome the privilege, thereby preventing disclosure or use of the protected documents in a public trial.
Given the undisputed constitutionally protected status of the communications at issue and the deleterious effects disclosure would have on the political consulting firm and its future activities, coupled with the extensive disclosures the firm has already made and the testimony it will provide at trial, further combined with the broad scope of discovery made available to the plaintiffs from other sources to prove their case, an order compelling the disclosure of the core political communications at issue would raise a serious federal question. *238 Put another way, compelled disclosure of the protected communications without a compelling justification could put our state judiciary in the discomforting position of defending how its own actions — not those of the legislative branch or an executive agency — meet First Amendment standards.
In a case from our state, Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963), the United States Supreme Court fifty years ago warned of the dangers of unduly intrusive governmental efforts to compel the disclosure of constitutionally-protected communications and information. In the midst of concerns about domestic activities of the Communist party, an investigative committee of the Florida Legislature in 1956 — pursuing efforts to discover subversive activities in Florida — attempted to force the president of the Miami branch of the NAACP to testify about its membership including fourteen who were alleged to have communist ties. The president, Mr. Gibson, refused to do so based on the associational rights of the organization, its members, and prospective members. He was adjudged in contempt, fined, and sentenced to six months’ imprisonment, which our state supreme court upheld. Id. at 543.
The United States Supreme Court reversed, holding that the legislative investigative committee was not entitled to compel Mr. Gibson to testify about such matters or make the organization’s membership records available. Id. at 558. It said the state must “convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest.” Id. at 546. It found no “substantial connection between the Miami branch ... and Communist activities,” which was an “essential prerequisite to demonstrating the immediate, substantial, and subordinating state interest necessary to sustain its right of inquiry into the membership lists of the association.” Id. at 551. The lack of a substantial foundational basis for inquiry about the fourteen named individuals prevented the committee’s inquiry, the evidence being “attenuated” or “merely indirect, less than unequivocal, and mostly hearsay testimony” thereby failing to justify the committee’s actions. Id. at 552, 554-55.
The Perry case aside, the principles of Gibson have direct application in this case. The political consulting firm at issue, though not of the stature or historically important lineage of the NAACP, is nonetheless entitled to judicial protection from governmental overreach when no substantial connection or need has been shown for the privileged information sought. In a passage relevant to this appeal, the Court in Gibson concluded:
To permit legislative inquiry to proceed on less than an adequate foundation would be to sanction unjustified and unwarranted intrusions into the very heart of the constitutional privilege to be secure in associations in legitimate organizations engaged in the exercise of First and Fourteenth Amendment rights; to impose a lesser standard than we here do would be inconsistent with the maintenance of those essential conditions basic to the preservation of our democracy.
Id. at 558. By parallelism, allowing judicially-sanctioned inquiry into the protected communications at issue in this case requires a substantial foundation lest the “heart of the constitutional privilege” be lost and the firm, and others similarly situated regardless of party affiliation, be chilled in their protected activities. Our judiciary is the last outpost to ensure that this privilege is protected, a serious responsibility and one where the supremacy *239 of federal law tempers the extent to which state constitutional provisions can be expanded. On the record presented to us, an inadequate foundation exists to intrude any further than has already been allowed; to do so would be an Icarian step too far.

. Perry v. Schwarzenegger, 591 F.3d 1147 (9th Cir.2010).

. In my view, the trade secrets argument presented by the non-parties lacked any merit, the only issue warranting discussion being the constitutional privilege.

. No basis existed under the circumstances to grant the movants’ request to pass the case through to the supreme court; the panel had already adjudicated the case expeditiously. The en banc majority, however, characterizes the plaintiffs' motion as "previously filed”-— without mentioning it was filed after briefing was over and after the panel had already sent its dispositive order for release — thereby leaving unspoken the motion’s belatedness under the circumstances. While Rule 9.125, Florida Rules of Appellate Procedure, allows ten days from the notice of appeal to file a pass through motion, the plaintiffs’ motion was filed on the eighth day, but by then the briefing process was over and panel order issued internally.

. NAACP v. Button, 371 U.S. 415, 431, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (quoting Sweety v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957)).

. The balancing “may take into account, for example, the importance of the litigation, ... the centrality of the information sought to the issues in the case, ... the existence of less intrusive means of obtaining the information, ... and the substantiality of the First Amendment interests at stake” as examples. Id. at 1161 and n. 7.